**HEUBLEIN, INC., Plaintiff,**

v.

**GENERAL CINEMA CORPORATION,
Defendant.**

**No. 82 Civ. 6751 (WCC).**

United States District Court,
S.D. New York.

March 9, 1983.

White & Case, New York City, for plaintiff; Thomas McGanney, Vincent R. Fitzpatrick, Jr., Margaret Murphy, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant; Robert E. Zimet, Linda Meisler, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This is an action under § 16(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78p(b),[1] to recover short-swing profits made by defendant General Cinema Corporation ("General Cinema"). Plaintiff Heublein, Inc. ("Heublein") alleges that defendant earned approximately $74 million in profits from its trading in the stock of Heublein, Inc. ("Old Heublein"), of which $30 million is attributable to transactions in violation of § 16(b). The case presents the question whether a § 16(b) "sale" occurs when a corporation responds to the perceived threat posed by substantial acquisitions of its stock by a

1. This section provides that:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

single shareholder by arranging a merger with a third party, and the shareholder then exchanges its stock for stock in the surviving company. This issue is currently of great moment because the facts underlying the instant action exemplify one of the most widely publicized, successful and presently popular strategies for achieving quick and substantial returns from a corporate stock investment.[2]

The case is currently before the Court on defendant's motion to dismiss pursuant to Rule 12(b)(6), F.R.Civ.P., or, alternatively, for summary judgment pursuant to Rule 56, F.R.Civ.P. For the reasons stated below, General Cinema's motion for summary judgment dismissing the complaint is granted.

## I.

On November 18, 1981, General Cinema began purchasing the common stock of plaintiff's predecessor, Old Heublein. By January 22, 1982, defendant had acquired 1,070,000 shares, or just under 5% of the common shares then outstanding. General Cinema continued its purchases, and in a Schedule 13D statement filed with the Securities and Exchange Commission ("SEC") on February 3, 1982, defendant revealed that it was the beneficial owner of 2,101,000 shares, or approximately 9.7% of Old Heublein's outstanding common stock.

In response to the public disclosure of this rapid accumulation, Old Heublein, on February 19, 1982, filed suit in this Court against General Cinema alleging, *inter alia,* that the Schedule 13D statement was false, misleading and failed to disclose that General Cinema's true intent in purchasing Old Heublein stock was to acquire control of Old Heublein. See Complaint in *Heublein, Inc. v. General Cinema Corp.,* 82 Civ. 1062 (MJL) (S.D.N.Y.1982). General Cinema nevertheless continued to acquire Old Heublein common stock, and by March 15, 1982 it owned 2,266,500 shares, comprising approximately 10.4% of the total stock then outstanding.

Further purchases through the beginning of May 1982 boosted General Cinema's holdings to 3,530,200 shares, or roughly 16.2% of the shares outstanding.

On April 29, 1982, Hicks Waldron, President and Chief Executive Officer of both Old Heublein and Heublein, approached executives at General Cinema and asked whether they would consider the possibility of an asset swap as a means of resolving their "dispute" without further litigation. Waldron proposed an exchange of the Old Heublein stock owned by General Cinema for part of Old Heublein's wine business.

---

**2.** In this increasingly familiar scenario, one corporation pressures a second corporation by purchasing significant quantities of its voting stock. The purchaser normally remains as vague and noncommittal as the SEC rules will allow when disclosing its ultimate purpose for the purchases and its intention with respect to future purchases. Management of the second corporation, often not content to wait complacently and accept the encroachments of this uninvited suitor, reacts adversely and attempts to ward off the intrusion through various legal maneuvers. Assuming the issuer's legal efforts are unsuccessful, the purchaser then relies upon its menacing presence to cause the issuer either to buy it out or to find a "white knight" rescuer. Either of these alternatives will almost invariably prove highly profitable for the purchaser, both because a purchaser pursuing this strategy will normally choose a company whose stock it perceives as undervalued by the market and because the incumbent management of the issuer will, in the interest of self-preservation, usually cause the company to pay

a substantial premium to rid itself of a threat to their continued tenure.

The stakes inherent in such a strategy may be very high. A purchaser who is able to force one of these two results may stand to gain many millions of dollars. See *generally, e.g.,* "Icahn's Scare Em Strategy Faces A Big Test in Fight Over Dan River," *The Wall Street Journal,* November 17, 1982 at 33 (describing Carl Icahn's exploitation of this strategy to earn profits of over $45 million during the past several years). Conversely, if the issuer succeeds in its legal challenge or resists the temptation either to buy out the purchaser at a profit or to seek aid from a third party, the purchaser may well suffer a severe financial loss and even find itself forced into an undesired minority shareholder position. See *generally id.* On the issuer's side, the success or failure of the purchaser's efforts, and the nature of the defensive strategy pursued by its own management, may fundamentally influence the future control over and structure of its business.

During the course of discussions on this and other proposals, Old Heublein provided General Cinema with information not available to the general public concerning Old Heublein's wine business. The negotiations broke off on May 10, and on May 11 General Cinema again commenced purchasing Old Heublein stock. Old Heublein, however, continued to make further overtures to defendant in an effort to repurchase its stock, all of which approaches were rejected by General Cinema.

Additional purchases between May 11 and May 26 brought General Cinema's holdings in Old Heublein common stock to 4,092,900 shares, or approximately 18.9% of the total then outstanding. This total represented an investment by General Cinema of more than $157 million. On May 28, General Cinema filed an amendment to its Schedule 13D statement reflecting its 18.9% ownership and stating that it had no present intention to purchase any additional shares. Further efforts at this point by Old Heublein to negotiate either a standstill or a buyback agreement with General Cinema proved unsuccessful.

On July 9, 1982, Old Heublein commenced discussions with R.J. Reynolds Industries, Inc. ("Reynolds") concerning a possible merger of their two businesses. Following those talks, on July 29, the boards of directors of Reynolds, R.J. Reynolds Tobacco Company ("Reynolds Tobacco"), a wholly-owned subsidiary of Reynolds, and Old Heublein approved such a merger. The transaction authorized by the respective boards included a tender offer by Reynolds for 11,350,000 shares, or approximately 52%, of Old Heublein's outstanding common stock, at a price of $63 per share in cash, and a subsequent merger of Old Heublein and Reynolds Tobacco by the exchange of the remaining Old Heublein shares for Reynolds common and preferred stock.

The Reynolds tender offer became effective on July 30 and was successfully completed on August 20, 1982. At a special meeting of Old Heublein shareholders held on October 12, 1982, the merger of Old Heublein and Reynolds Tobacco was approved despite the fact that General Cinema voted its 4,092,900 shares against the merger. That same day, pursuant to the terms of the merger, the 4,092,900 shares of Old Heublein stock owned by General Cinema were exchanged for Reynolds stock at an average price of $56.83 per share of Old Heublein stock.

## II.

The legal contentions of the parties can be clearly and succinctly stated. Plaintiff alleges that the exchange by General Cinema of its Old Heublein shares for Reynolds shares on October 12 was a "sale" of an equity security within the meaning of § 16(b) of the Act. Because General Cinema was the beneficial owner of greater than 10% of Old Heublein's outstanding common stock at all times between March 15, 1982 and October 12, 1982, plaintiff asserts that all profits earned by General Cinema and attributable to shares purchased after April 12, 1982 constitute short-swing profits by an insider and thus are recoverable under § 16(b) by Heublein as successor in interest to Old Heublein.

Defendant does not dispute the foregoing facts [3] but merely argues that the exchange of stock on October 12, 1982 pursuant to the merger was not a "sale." Thus, General Cinema contends that its transactions do not come within the six-month limitation of § 16(b). The bounty riding on the resolution of this issue is substantial. If plaintiff is correct in its assessment of defendant's exchange of stock, it will be entitled to recover approximately $30 million of the nearly $74 million in profits realized by General Cinema on its $157 million invest-

3. There is some disagreement between the parties concerning the correct characterization of the information furnished by Old Heublein to General Cinema to facilitate General Cinema's consideration of the asset-swap proposal and the content of the advice General Cinema re-

ceived from its investment advisor the First Boston Corporation ("First Boston"). However, as explained more fully below, these matters do not pose material issues of fact that preclude the granting of summary judgment. See Rule 56, F.R.Civ.P.

ment in Old Heublein common stock. If not, then General Cinema will be permitted to carry away all the spoils of the expedition.

## III.

The starting point for the Court's analysis is the decision of the Supreme Court in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). In *Kern County,* the Court adopted a "pragmatic approach" to questions of § 16(b) liability in cases involving unorthodox transactions. See *id.* at 594–95, 93 S.Ct. at 1744–45; *Lane Bryant, Inc. v. Hatleigh Corp.*, 517 F.Supp. 1196, 1200 (S.D.N.Y.1981). Under this approach, a court determines whether a borderline transaction, *i.e.*, a transaction not ordinarily thought of as a sale or purchase but arguably within the broad statutory definition, comes within the reach of § 16(b) by inquiring "whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." 411 U.S. at 594, 93 S.Ct. at 1744 (footnote omitted). A court may undertake this flexible analysis, however, only in the limited instances where an ambiguous transaction is involved. See *Lewis v. Varnes,* 505 F.2d 785, 789 (2d Cir.1975). In all other situations, § 16(b) imposes an objective standard of strict liability for all transactions occurring within the statutory time limits. See *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972).

Using a pragmatic analysis, the Court ruled in *Kern County* that when the target of a tender offer defends itself by merging into a third company and the tender offeror then exchanges his stock for stock of the surviving company, the exchange is not a § 16(b) "sale." *Id.* 411 U.S. at 600, 93 S.Ct. at 1747; see *also id.* at 584, 93 S.Ct. at 1739. In that case, the defendant, Occidental, after unsuccessfully seeking to merge with Old Kern, the predecessor of the plaintiff, first made a tender offer for 500,000 shares, or more than 10% of the outstanding shares, of Old Kern, and then extended its offer to seek an additional 500,000 shares. Old Kern's management responded to the original offer by sending a letter to its shareholders urging them not to tender their shares. When Occidental extended its offer, the president of Old Kern sent a telegram to all shareholders, again advising against tender, and also undertook merger discussions with Tenneco, Inc. Thereafter, the boards of Old Kern and Tenneco approved a merger whereby the shareholders of Old Kern would receive one share of Tenneco convertible preferred stock for each share of Old Kern common that they owned.

Occidental attempted to block the proposed merger through various legal maneuvers, but ultimately dropped those efforts after negotiating certain option arrangements with Tenneco.[4] At a meeting of Old Kern shareholders to vote on the merger, Occidental did not vote its shares, but indicated that had it been voting it would have voted in favor of the merger. Once the merger was closed, all Old Kern shareholders, including Occidental, became irrevocably entitled and committed to exchange their Old Kern holdings for Tenneco preferred stock.[5]

In ruling that this exchange did not constitute a § 16(b) "sale," the Court was ap-

---

**4.** Occidental entered into an agreement with Tenneco whereby Tenneco had a binding option to purchase Occidental's holdings at a date more than six months in the future. The Court also ruled that the execution of this option agreement was not a "sale" under § 16(b). See 411 U.S. at 601–04, 93 S.Ct. at 1748–49.

**5.** The merger transaction was closed on August 30, 1967. At that time, Occidental became irrevocably entitled to receive the Tenneco preferred shares. Occidental, however, did not

actually exchange the certificates until December 11, 1967, when it made the exchange and then endorsed the new certificates over to Tenneco pursuant to the terms of the option arrangement the two companies had entered into prior to the consummation of the Old Kern/Tenneco merger. Occidental's total profit was slightly more than $19.5 million on the shares obtained through its tender offer. See 411 U.S. at 589–90, 93 S.Ct. at 1741–42.

parently motivated by two factors: (1) the involuntary nature of the exchange, and (2) the absence of the possibility of speculative abuse of inside information.[6] As to the first factor, the Court observed that the merger was not engineered by Occidental, but was sought by Old Kern to frustrate Occidental's attempts to gain control of Old Kern. Moreover, once the merger was approved, Occidental had no real alternative with respect to the future of its Old Kern shares. Although Occidental could theoretically have sold its shares prior to the ultimate approval of the merger, the Court indicated that such an act would certainly have subjected Occidental to *prima facie* § 16(b) liability. See 411 U.S. at 599–600, 93 S.Ct. at 1747. As to the second factor, the Court noted that although Occidental was a statutory insider at the time it extended its tender offer,[7] its adversarial posture with respect to Old Kern's management afforded little possibility of its access to inside information by virtue of its stock ownership. See *id.* at 598–99, 93 S.Ct. at 1746–47.

In *American Standard, Inc. v. Crane Co.,* 510 F.2d 1043 (2d Cir.1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975), the Court of Appeals for the Second Circuit followed the approach set forth in *Kern County* and reached the same result on slightly different facts. The defendant in that action, Crane, began purchasing large quantities of the common stock of Westinghouse Air Brake Company on the open market. Air Brake declined Crane's proposals for merger and responded by arranging a defensive merger with Standard. In the face of this previously announced, proposed merger, Crane, which at this time owned more than 10% of Air Brake's outstanding stock, made a tender offer for Air Brake shares. Crane's tender offer ulti-mately failed, as did its legal efforts to block the merger. Once the merger was approved and became effective, Crane exchanged its Air Brake common shares for preferred shares of Standard pursuant to the terms of the merger. Crane thereafter sold virtually all of these shares on the New York Stock Exchange, reaping a profit in excess of $10 million on its investment.

The Second Circuit found that both factors relied upon by the Supreme Court in *Kern County* were also present in *American Standard.* There existed an atmosphere of hostility, making it unlikely that Crane would have access to inside information by virtue of its greater than 10% ownership, as well as a situation where Crane was powerless to control the course of events in the face of opposition by Standard's management. See *id.* at 1054. Although the court concluded that there were some differences from the situation in *Kern County,* including, primarily, the fact that Crane continued to fight to defeat the Standard merger while Occidental gave up in the face of Old Kern's proposed merger with Tenneco, it reasoned that these differences did not alter the fundamental similarity between the two transactions. See *id.* at 1053. Thus the court held that Crane's exchange of shares was not a "sale" and would not subject it to § 16(b) liability for short-swing profits. *Id.* at 1055.

## IV.

Plaintiff offers several arguments in support of its contention that the exception set forth by the Supreme Court in *Kern County,* and illuminated by the Second Circuit in *American Standard,* to the normal, strict liability standard literally provided by § 16(b), is inapplicable to the instant facts. First, Heublein asserts that this is not a

---

**6.** The Court stated:

> We do not suggest that an exchange of stock pursuant to a merger may never result in § 16(b) liability. But the involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that § 16(b) should not apply to transactions such as this one.

411 U.S. at 600, 93 S.Ct. at 1747.

**7.** A shareholder is considered a statutory insider when he owns greater than 10% of a single class of a registered equity security. See 15 U.S.C. § 78p(a). In *Kern,* Occidental was such an insider by the time it had successfully completed its initial tender offer for 500,000 shares.

borderline or an unorthodox case, and that there is therefore no basis for pursuing a pragmatic analysis of the transactions involved. Further, even assuming the Court undertakes such a flexible analysis, Heublein argues that the transactions involved here do not place this case within the *Kern County* exception because (1) General Cinema's exchange of Old Heublein stock for Reynolds stock pursuant to the merger was not "involuntary," and (2) General Cinema's status was such that it had access to inside information. These arguments will be considered separately.

### 1. The Unorthodox Nature of the Transaction

■ The Court need not dwell long on Heublein's first contention that the transactions involved in this case should not be scrutinized in accordance with the subjective analysis followed in *Kern County*. In its submissions to the Court, Heublein characterizes *Kern County* as a "tender offer exception" applicable only to "a defeated, legitimate tender offeror." See Heublein's Brief in Opposition to Defendant's Motion at 41. From this erroneous premise, it naturally proceeds to the conclusion that because there was no tender offer in this case, there is no justification for even reaching the pragmatic approach.[8] This argument ignores the Supreme Court's rationale for adopting such an approach to § 16(b) liability in limited special circumstances.

In *Kern County* the Court was concerned that because the statutory definitions of "purchase" and "sale" are so broad, certain "unorthodox transactions," not normally deemed purchases or sales might illogically be caught within the reach of § 16(b), extending the statute beyond its intended limits. See *Kern County, supra,* 411 U.S. at 593–95, 93 S.Ct. at 1744–45. As several

courts have observed, early cases applying § 16(b) under the strict, objective standard produced a result which might be likened to throwing out the baby along with the bathwater. See, *e.g., Makofsky v. Ultra Dynamics Corp.,* 383 F.Supp. 631, 637 (S.D.N.Y.1974). Thus, the Supreme Court concluded that in these borderline cases involving an "unorthodox transaction,"[9] a pragmatic approach by the courts in determining § 16(b) liability would best serve the statutory goal of preventing short-swing speculation based upon inside information, without reaching other conduct not giving rise to the potential for such abuse. See *Kern County, supra,* 411 U.S. at 594, 93 S.Ct. at 1744. Of course, in cases involving "garden variety" purchases and sales, however, the objective test for § 16(b) liability is still the rule. *E.g., Makofsky, supra,* 383 F.Supp. at 637.

It is clear that a pragmatic inquiry is justified in this instance because the transaction sought to be classified as a "sale," a forced exchange of securities pursuant to a merger, is simply not a "garden variety" sale. This type of exchange was expressly mentioned by the Supreme Court as being within the class of "unorthodox transactions." *Kern County, supra,* 411 U.S. at 593 n. 24, 93 S.Ct. at 1744 n. 24. Whether this Court ultimately determines that General Cinema's transactions should be subject to § 16(b) liability is entirely irrelevant to whether it should make that determination by using this flexible type of analysis or, instead, by applying an objective standard. Simply because the Court undertakes a pragmatic analysis does not guarantee that the transaction under scrutiny will be exempt from § 16(b) liability. Rather, that approach only ensures that liability will not attach to transactions which do not threaten the evils § 16(b) is designed to prevent.

---

8. Plaintiff states:

 General Cinema can take this position only by arguing that this is a "borderline" case so that the "pragmatic approach" applies. We find nothing in the case that suggests that the tender offer exception applies, and thus see no justification for even getting to the "pragmatic approach."

Heublein's Brief in Opposition to Defendant's Motion at 42.

9. To the extent Heublein's argument assumes that a "borderline" case is other than simply one involving an "unorthodox transaction," it is based upon a misreading of *Kern County.* See *Kern County, supra,* 411 U.S. at 593–94, 93 S.Ct. at 1744.

Heublein's threshold argument is, therefore, rejected.

### 2. *The Involuntary Nature of the Transaction*

█ An exchange pursuant to a merger is "involuntary" under the *Kern County* analysis where the party making the exchange has an "utter inability . . . to control the course of events." *American Standard, supra,* 510 F.2d at 1054. Despite Heublein's overblown references to the frivolity of General Cinema's position,[10] I am persuaded that the exchange in question was "involuntary" under this standard.

Once a merger was agreed upon by the boards of Old Heublein, Reynolds Tobacco, and Reynolds, General Cinema was utterly powerless to influence subsequent events. Although approval by a majority of Old Heublein's shareholders was necessary prior to consummation of the merger, Old Heublein's management had the necessary votes regardless of the stance adopted by General Cinema. As it turned out, Old Heublein's shareholders approved the transaction despite the negative vote by General Cinema of its 4,092,900 shares.[11] In this sense, the transaction is virtually identical to that in issue in *Kern County.* In that case, despite Occidental's failure to vote its shares either for or against the merger, the transaction was approved by a majority of Old Kern's shareholders.[12] The fact that Occidental was not in a position to affect the outcome of the vote was central to the Court's finding of "involuntariness," see *Kern County, supra,* 411 U.S. at 599, 93 S.Ct. at 1747, and it is a factor that is even more clearly present in the instant case, where General Cinema voted against the merger.

Moreover, once the merger was approved, General Cinema, like Occidental in *Kern County,* was left with no viable alternatives concerning the future of its Old Heublein shares. A voluntary open-market sale at that point would have resulted in certain § 16(b) liability. See *id.* at 600, 93 S.Ct. at 1747. Nor do I believe that the existence of appraisal rights provided General Cinema with a more promising option. A decision to exercise those rights would likewise have constituted a voluntary election by General Cinema to exchange its shares of Old Heublein for cash. Although the Court in *Kern County* noted in passing that the merger in that case left the dissenters with no appraisal rights for their stock, see *id.,* that observation should not be construed as a

10. Heublein makes the disingenuous assertion that "General Cinema can hardly argue with a straight face that its exchange was 'involuntary.'" Heublein's Memorandum in Opposition to Defendant's Motion at 51.

11. Heublein characterizes General Cinema's vote against the merger as a "sham" because General Cinema allegedly knew that enough votes existed to approve the merger without its affirmative endorsement and because it failed to exercise its appraisal rights. See Heublein's Memorandum in Opposition to Defendant's Motion at 67. Obviously, the Court cannot hypothesize as to whether General Cinema would have voted in this same manner had its votes been effective to defeat the merger. In such a situation, the mere existence of that degree of influence would have been effective to rebut any claim that the exchange pursuant to a resulting merger was "involuntary." In the instant case, however, it is precisely because General Cinema's votes were entirely without significance that its subsequent exchange of stock can be classified as "involuntary." Far from being a "sham," General Cinema's vote serves to underscore the irrelevance of its position to the subsequent course of the transaction.

Moreover, if a "sham" could be found in this context, the facts underlying *Kern County* are more susceptible of such an interpretation than are those in the instant case. In *Kern County,* the Court noted that although Occidental did not vote its shares, it did disclose that had it been voting it would have voted to approve the merger. See *Kern County, supra,* 411 U.S. at 588, 93 S.Ct. at 1741. Occidental's refusal to vote in favor of a transaction it had publicly characterized as fair to Old Kern's shareholders, which refusal was perhaps based upon a fear of incurring § 16(b) liability, was not characterized by the Court as a "sham" and did not dissuade the Court from finding that Occidental's exchange was "involuntary." Heublein's other argument with respect to General Cinema's failure to exercise its appraisal rights will be considered fully below.

12. As the Court aptly noted, abstention was tantamount to a vote against the merger. See *Kern County, supra,* 411 U.S. at 588 n. 17, 600, 93 S.Ct. at 1741 n. 17, 1747.

proclamation that the existence of an appraisal option will result in § 16(b) liability. Such a situation was simply not before that Court.[13]

On close analysis, it is apparent that the existence of appraisal rights should not affect the involuntary nature of the transaction. Once the Old Heublein/Reynolds merger was approved, the nature of General Cinema's investment was bound to change. That change was forced by operation of the merger terms and not by any unilateral decision by General Cinema to alter its investment. Thus, the existence of a choice between alternative types of forced exchanges—either into cash through appraisal or into stock in the merged company—does not render the exchange voluntary.[14]

Heublein also attempts to avoid the conclusion that General Cinema's exchange was forced by arguing that General Cinema's manner of purchasing Old Heublein stock gave it the ability to "control the course of events," and was specifically designed to cause Old Heublein to arrange a merger. Sophisticated speculation as to the probable reactions of another is not, however, a substitute for the ability to exert control over those reactions. Acquisitions based upon such speculation are not among the evils § 16(b) is designed to prevent when engaged in by those without inside information about the issuer. As the Second Circuit stated in *American Standard*:

> It is not enough that a sophisticated tender offeror may assume that if his bid fails because of a defensive merger he will probably profit if the defensive merger actually occurs. Such speculation is common but is not the product of inside information. It is rather a sophisticated prophecy which is open to all public stockholders who possess no inside information whatever.

510 F.2d at 1054–55.[15]

General Cinema's prophetic assumption that Old Heublein's officers and directors

---

**13.** The exercise of appraisal rights obviously has more in common with the "garden variety" stock-for-cash sale than does an exchange pursuant to a merger. First, it is a voluntary choice and second, it results in the liquidation of an investment rather than merely a change in its character.

**14.** The nature of appraisal rights themselves further demonstrates their inability to serve as a viable alternative to a forced exchange. Dissenter's appraisal rights are provided for those who believe that what they are to receive for their investment pursuant to the terms of a merger does not fairly reflect the true value of their investment. As *Kern County* demonstrates, a decision to vote against a merger does not necessarily imply that the dissenter believes the terms of the transaction to be unfair to the shareholders. See *Kern County, supra,* 411 U.S. at 588 [93 S.Ct. at 1741]. If the terms are fair there is no reason to exercise appraisal rights.

**15.** In *Kern County* the Supreme Court stated that:

> It is also wide of the mark to assert that Occidental, as a sophisticated corporation knowledgeable in matters of corporate affairs and finance, knew that its tender offer would either succeed or would be met with a "defensive merger." If its takeover efforts failed, it is argued, Occidental knew it could sell its stock to the target company's merger partner at a substantial profit. Calculations of this sort, however, whether speculative or not and whether fair or unfair to other stockholders or to Old Kern, do not represent the kind of speculative abuse at which the statute is aimed, for they could not have been based on inside information obtained from substantial stockholdings that did not yet exist. Accepting both that Occidental made this very prediction and that it would recurringly be an accurate forecast in tender-offer situations, we nevertheless fail to perceive how the fruition of such anticipated events would require, or in any way depend upon, the receipt and use of inside information. If there are evils to be redressed by way of deterring those who would make tender offers, § 16(b) does not appear to us to have been designed for this task, 411 U.S. at 597–98, 93 S.Ct. at 1746 (footnote omitted).

Moreover, the Court did not view the situation as appreciably different once Occidental achieved statutory insider status.

> [Occidental] was thus a statutory insider when, on May 11, it extended its tender offer to include another 500,000 shares. We are quite unconvinced, however, that the situation had changed materially with respect to the possibilities of speculative abuse of inside information by Occidental. Perhaps Occidental anticipated that extending its offer would increase the likelihood of the ultimate success of its takeover attempt or the occur-

would react to its presence as a substantial shareholder by arranging a merger with a third party simply does not constitute an ability to control the course of events, as alleged by plaintiff. The decision to react adversely to General Cinema's acquisitions was the free choice of the officers and directors of Old Heublein, none of whom was a representative of General Cinema. These officers and directors were in complete control of both the nature and timing of any response. Their decision to effect a merger with a third party within six months of many of General Cinema's purchases, and thereby subject General Cinema to possible § 16(b) liability, was an exercise of their exclusive power to run the affairs of Old Heublein. As the shareholder vote demonstrates, General Cinema was powerless to alter their chosen course. If they had not arranged such a merger, the mandatory disgorgement remedy of § 16(b) would effectively have prevented General Cinema from selling its shares within a six-month period after their acquisition. See generally Note, Exchange of Stock Pursuant to Merger is "Sale" by an Insider Under Section 16(b) of Securities Exchange Act of 1934, 84 Harv.L.Rev. 1012, 1022 (1971).

Nor can it be said that a merger was a necessary consequence of General Cinema's purchases. Neither the manner of General Cinema's purchases nor any actions it took in connection therewith forced Old Heu-

blein into the transaction its officers and directors ultimately arranged. If these officers and directors had not sensed a threat to their jobs and continued control over Old Heublein, they might not have reacted in the manner they did. No external factors were present to prevent the continued existence of Old Heublein with General Cinema as a substantial or even a majority shareholder. Nor were General Cinema's actions in acquiring a potentially influential stake in another company improper. Economic competition is, after all, the vitalizing force of the securities markets. It exists as much for the protection of investors as for the provision of profit opportunities. See also Note, Exceptions to Liability Under Section 16(b): A Systematic Approach, 87 Yale L.J. 1430, 1443 n. 78 (1978). To find defendant's exchange "voluntary," and thereby obligate it to disgorge any profits to plaintiff, could seriously disrupt the free competition of the market place.[16] See id. Accordingly, for all the reasons discussed above, I conclude that defendant's exchange of shares pursuant to the Old Heublein/Reynolds Tobacco merger was an "involuntary" transaction.[17]

### 3. Access to Inside Information/Potential for Speculative Abuse

The principal distinction between the instant case and both Kern County and American Standard is that defendant here

---

rence of a defensive merger. But, again, the expectation of such benefits was unrelated to the use of information unavailable to other stockholders or members of the public with sufficient funds and the intention to make the purchases Occidental had offered to make before June 8, 1967.
Id. at 598, 93 S.Ct. at 1746.

**16.** If liability were to be imposed on defendant in this instance, it would provide a very powerful weapon in the hands of incumbent management and would effectively prevent an investor from making rapid, open-market purchases of an issuer's securities above the 10% level. Moreover, knowledge that the survivor in a merger could recover short-swing profits from an unwelcome statutory insider could, in cases such as this, make the issuer a much more attractive merger partner. See Note, supra, 87 Yale L.J. at 1443 n. 8.

**17.** The cases cited by Heublein for the proposition that General Cinema's actions have crossed the very low threshold necessary for finding "voluntariness" are all inapposite. See Heublein's Brief in Opposition to Defendant's Motion at 51–52. Those cases all involved situations where a party made a pressured choice to sell its stock because of certain external exigencies. Present in those cases, but absent in the instant circumstances, is the element of control; the sellers all made the choice, albeit not completely uncoerced, to sell. See, e.g., Makofsky v. Ultra Dynamics Corp., 383 F.Supp. 631, 641 (S.D.N.Y.1974). In the instant case, however, the decision to make what plaintiff has classified as a "sale" was made by plaintiff's predecessor, and not by defendant, the party sought to be charged with the "sale."

never made a formal tender offer. The important question for § 16(b) purposes, however, is whether General Cinema's position as an "unwelcome investor,"[18] owning more than 10% of Heublein's outstanding common stock, afforded it access to inside information in a manner that raised the potential for speculative abuse, which was lacking in *Kern County* and *American Standard*. Although the question is not free of doubt, I conclude that an unwelcome investor who is forced to exchange his stock pursuant to a merger arranged by the issuer to rid itself of the investor's threat to obtain control should be treated for purposes of § 16(b) liability in the same manner as a defeated tender offeror who must make a similar exchange after losing the battle to a white knight. Such transactions simply do not give rise to a potential for speculative abuse.

Plaintiff contends that the inside information to which General Cinema had access[19] was of three types: (1) confidential information concerning Old Heublein obtained by General Cinema from First Boston; (2) General Cinema's inside information concerning its own objectives and plans; and (3) nonpublic information obtained by General Cinema through direct contacts with Old Heublein's management. The first two of these three assertions can be briefly dismissed. The third, however, deserves fuller discussion.

Through an affidavit of Jack Chisolm, Director of Corporate Development for Heublein, plaintiff states that during the period between 1979 and 1981, Old Heublein discussed with First Boston the possibility of Old Heublein's retaining First Boston as its investment advisor. Although that relationship was never established, Heublein alleges that First Boston came away from these meetings possessing an intimate familiarity with Old Heublein that was otherwise unavailable. This information, plaintiff contends, was later revealed to General Cinema while First Boston was acting as General Cinema's investment advisor.

■ While this theory may well raise serious ethical questions concerning the conduct of First Boston, it has absolutely no bearing on General Cinema's possible § 16(b) liability. As the Second Circuit clearly stated in *American Standard*, for § 16(b) liability to be imposed on a statutory insider pursuant to an unorthodox transaction, it must have access to inside information by reason of its greater than 10% stock ownership. *American Standard, supra*, 510 F.2d at 1055. Assuming, *arguendo*, that First Boston improperly revealed confidential information about Old Heublein to General Cinema, those disclosures did not result from General Cinema's stock ownership. While the acquisition and use of such information might violate some other provision of the federal securities laws, it is not one of the evils which § 16(b) of the Act was designed to prevent.[20]

Heublein's second contention that General Cinema's knowledge about its own objectives and plans somehow constitutes inside information is equally unavailing.[21] An investor always has knowledge about his own actions and intentions which does not derive from his relationship to the issuer. Nor does such knowledge suddenly become inside information because the investor thereafter becomes a greater than 10% shareholder. If General Cinema did not ade-

18. Heublein's Sur-Reply in Opposition to Defendant's Motion at 4.

19. Under § 16(b), it is required only that a defendant have access to such information. Whether defendant actually abused or even intended to profit from the information is irrelevant. See *Kern County, supra*, 411 U.S. at 595, 93 S.Ct. at 1745.

20. As the Second Circuit stated in *American Standard*:

The otherwise casual acquisition of inside information through personal friendship and its use could be a violation of Section 10(b) and Rule 10b–5, but the irrebuttable presumption of § 16(b) should not be applied. 510 F.2d at 1055.

21. Plaintiff's analogy to the 1930's "pooling" arrangements is untenable. These pools were secret conspiracies by groups of insiders to manipulate the price of the stock with the intention of deceiving public shareholders. This is hardly comparable to the instant situation.

quately comply with its statutory duties to disclose the purposes for its purchases of Old Heublein stock, then its conduct may well have constituted a violation of § 13(d) or some other provision of the Act, but not § 16(b).[22] This is not the type of abuse which gave rise to the proscriptions of that section. *Accord Kern County, supra,* 411 U.S. at 597–98, 93 S.Ct. at 1746 (insider's anticipation that its actions will result in defensive merger not dependent upon inside information; § 16(b) not designed to deter making of tender offers).

The only troublesome issue concerns the possibility that General Cinema had access to inside information by virtue of its direct relationship to the issuer, Old Heublein. Plaintiff argues that because General Cinema never made a formal tender offer for Old Heublein and because Old Heublein's officers met with General Cinema in an attempt to repurchase the Old Heublein stock owned by General Cinema, defendant clearly had access to inside information. In *American Standard,* the court stated:

> The very concept that stock ownership beyond a certain percentage makes the owner a statutory "insider" was based on the assumption that such percentage was enough to make him an "influential stockholder." The 10% holder in the garden variety case is presumed to be "influential" as a friend of management or in control of some directors.

510 F.2d at 1055 (footnote omitted).

■ Because the underlying facts are completely devoid of any suggestion that this type of influence existed, I conclude that § 16(b) access was not present in the instant case. Both *Kern County* and *American Standard* involved a hostile tender offer which is the antithesis of a control relationship. See *id.* But there is no merit in plaintiff's suggestion that these cases stand for the proposition that the *only* instance in which the presumption of "insider" status for a 10% shareholder can be rebutted is

where there is a formal tender offer. The rationale for a pragmatic analysis is, after all, the need for examination of the opportunities for speculative abuse inherent in particular unorthodox situations, instead of applying an objective, and therefore mechanical and arbitrary, standard for § 16(b) liability.

In the instant case, despite the absence of a formal declaration of war, such as is present in a tender offer situation, there are other clear indicia of Old Heublein's uncompromising hostility toward General Cinema's acquisitions. At all times from February 9, 1982, just before General Cinema became a 10% shareholder, through the consummation of the Old Heublein/Reynolds Tobacco merger, General Cinema was the defendant in a lawsuit brought by Old Heublein under § 13(d) of the Act. Plaintiff itself has characterized General Cinema as an "unwelcome investor." See note 17, *supra.* Moreover, it is undisputed that General Cinema had no control over any of Old Heublein's directors or any input into the company's management. On these facts, it is clear that the type of adversarial relationship that typifies a tender offer situation was present here, thus negating any implication of access to inside information by virtue of stock ownership exceeding 10%.

The questionable aspect of the instant case, however, is the occurrence of repurchase discussions between Old Heublein and General Cinema. As noted above, Old Heublein first approached General Cinema in April 1982 with a proposal for an asset swap for reacquisition of its shares owned by General Cinema. Although an agreement was never reached, the parties did engage in negotiations before the proposal was ultimately rejected by General Cinema. During the course of these negotiations, Old Heublein provided defendant with certain nonpublic information concerning its wine business,[23] but expressly warranted that the

---

**22.** Old Heublein did, in fact, commence a suit under § 13(d) of the Act, but that action was dismissed on November 17, 1982. See *Heublein Inc. v. General Cinema Corp.,* 82 Civ. 1062 (S.D.N.Y.1982) (MJL).

**23.** The information provided to General Cinema described Old Heublein's wine business. The portion of that information plaintiff claims was "confidential" included (a) the book value of the assets of United Vinters, Old Heublein's

material so provided was not "material information" under the federal securities laws.[24]

Plaintiff now contends that by disclosing this nonpublic, but concededly nonmaterial, information to defendant, its predecessor was furnishing defendant with "inside" information. What constitutes inside information for § 16(b) purposes has never been clearly defined by either the Supreme Court or the Court of Appeals for this Circuit. The Ninth Circuit, however, in a case cited with approval by both parties, stated that:

> Insider information, to which Section 16(b) is addressed, does not mean all information about the company that is not public knowledge. Insider information within the meaning of Section 16(b) encompasses that kind of confidential information about the company's affairs that would help the particular [investor] to make decisions, affecting his market transactions in [the issuers] securities.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston,* 566 F.2d 1119, 1121 (9th Cir. 1978).

Heublein asserts that this definition is unrelated to the concept of materiality applicable to other provisions of the federal securities laws, but I cannot agree.

In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Court held that information is material under § 14(a) of the Act if "there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." *Id.* at 449, 96 S.Ct. at 2132. This same standard has been applied to other provisions of the Act, such as § 10(b) and § 14(e). See *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 360–61 (2d Cir.1979); *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). In both letter and spirit, the Supreme Court's standard for "material" information is substantially the same as the definition of "inside" information set forth in *Livingston.* Both definitions encompass only information that would likely influence a reasonable investor's investment decision.

Although Heublein urges that § 16(b) is specifically designed to avoid the necessity for an inquiry into whether material information was involved, that situation exists only where conventional transactions are involved and § 16(b) liability is imposed on an objective basis. When a court engages in a pragmatic analysis because an unorthodox transaction is involved, there are compelling reasons for applying a materiality standard in judging § 16(b) liability. Section 16(b) is concerned with preventing the speculative abuse of inside information. See *Kern County, supra,* 411 U.S. at 600, 93 S.Ct. at 1747. But it is only if the investor has access to material information that he might be able to exploit his advantage to the detriment of the general investing public. If information is not material, it is by definition not significant to an investment decision, and therefore it could not afford an opportunity for speculative abuse.

Since Old Heublein expressly warranted that the information it provided to General Cinema was not material, there are compelling equitable reasons why plaintiff should not be permitted to seek General Cinema's profit by now claiming just the opposite. Moreover, the relationship between Old Heublein and General Cinema makes it appear highly unlikely that defendant would by its status have access to material inside information. The transaction then contemplated involved a transfer of assets to General Cinema in exchange for its Old Heublein shares. In these circumstances, Old Heublein's representatives could hardly be expected to disclose non-public information which would have made its shares appear more valuable to General Cinema. Even if

---

wine subsidiary, (b) the amount of Old Heublein's investment in United Vinters, and (c) estimated sales figures for Heublein's wine business in 1982 and 1983. See Waldron Affidavit at ¶ 15.

**24.** See Letter Agreement dated May 7, 1982 between Richard A. Smith, President of General Cinema, and Hicks B. Waldron, President of Old Heublein.

they already envisioned the possibility of a merger with Reynolds or some other white knight, they would surely guard against any hint of such a contingency, which would tend to cause General Cinema to hold its shares in anticipation of the almost certain resulting rise in the market price.[25] Thus, under the instant facts, there exists nothing to suggest that General Cinema had access to material inside information.

## V.

■ Because General Cinema had absolutely no control over the course of events chosen by Old Heublein's management, and because it was unlikely that General Cinema could have received any advance, inside information concerning these events, this is not the sort of transaction that could give rise to the type of speculative abuse against which § 16(b) is directed. Accordingly, the Court concludes that General Cinema's exchange of Old Heublein stock for Reynolds stock was not a "sale" under § 16(b) of the Act.

Although a contrary result would have had the effect of precluding an outsider from buying up a large amount of a company's stock and thereby exerting pressure on the company's management, as described in footnotes 3 and 16 *supra,* it does not appear that § 16(b) was designed for that purpose. *Cf. Kern County, supra,* 411 U.S. at 597–98, 93 S.Ct. at 1746 ("If there are evils to be redressed by way of deterring those who would make tender offers, § 16(b) does not appear to us to have been designed for this task."). Allowing recovery on the instant facts would do nothing more than provide a windfall for the incumbent management of Heublein and its merger partners, Reynolds and Reynolds Tobacco. The shareholders of Old Heublein who participated in the merger received a premium over the market price for their shares precisely because of the merger. The only people who were injured if General Cinema has, in fact, done

something improper are the former shareholders of Old Heublein who sold their stock to General Cinema during the period when General Cinema made its open-market purchases. But § 16(b) does not provide this class with any avenue of relief. If there are injuries to be redressed, the remedies lie elsewhere in the federal securities laws, possibly in § 10(b) of the Act or § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, but not in § 16(b).

For the reasons stated above, I find that there exists no material issue of fact and that defendant is entitled to judgment as a matter of law. See Rule 56, F.R.Civ.P. Defendant's motion for summary judgment dismissing the complaint is, therefore, granted.

SO ORDERED.

---

**25.** *But* see *Kramer v. Ayer,* 1975–76 Fed.Sec.L. Rep. (CCH) ¶ 95,483 at 99,438 (S.D.N.Y.1976) (finding on somewhat different facts that because issuer approached defendant concerning

a merger, it was likely to have disclosed inside information in effort to convince defendant of desirability of a merger).