*Donoghue v. Tannenbaum*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of July, two thousand twenty-three.

Present:

> JOHN M. WALKER, JR.,
> WILLIAM J. NARDINI,
> EUNICE C. LEE,
> *Circuit Judges.*

---

DENNIS J. DONOGHUE, as the Administrator of the ESTATE OF DEBORAH DONOGHUE, MARK RUBENSTEIN,

*Plaintiffs-Appellants*,

v.                                                          22-1156

LEONARD M. TANNENBAUM,

*Defendant-Appellee*,


OAKTREE SPECIALTY LENDING CORPORATION,

*Nominal Defendant*.


| For Plaintiffs-Appellants: | MIRIAM TAUBER (James A. Hunter, Law Office of James Austin Hunter, Pipersville, PA; David Lopez, Law Office of David Lopez, Southampton, NY, *on the brief*), Miriam Tauber Law PLLC, New York, NY. |
|---|---|

For Defendant-Appellee: JEFFREY A. UDELL (Christopher J. Dioguardi, *on the brief*), Walden Macht & Haran LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this order.

Plaintiffs-Appellants appeal from an April 25, 2022, judgment of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*) granting summary judgment for Defendant-Appellee Leonard M. Tannenbaum and denying Plaintiffs' cross-motion for summary judgment. Plaintiffs, shareholders of Oaktree Specialty Lending Corporation ("OCSL"), seek to recover alleged short-swing profits obtained by Tannenbaum under section 16(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78p(b).

In October 2017, Tannenbaum sold management rights over two companies he founded to nonparty Oaktree Capital Management, L.P. ("Oaktree Capital"). The companies became OCSL and Oaktree Strategic Income Corporation ("OCSI"). Tannenbaum continued to be a shareholder in OCSL and OCSI. However, as a condition of sale, he entered into two identical voting agreements (the "Voting Agreements") on July 13, 2017, which were publicly filed with the SEC. The Voting Agreements required Tannenbaum to vote his shares in OCSL and OCSI in accordance with Oaktree Capital's written instructions. Yet, if Oaktree Capital declined to instruct Tannenbaum how to vote his shares, the Voting Agreements afforded Tannenbaum the ability to vote his shares freely. The Voting Agreements also prohibited Tannenbaum from proposing to influence or control the management or policies of OCSL and OCSI.

2

On October 28, 2020, OCSL and OCSI entered into an agreement to merge OCSI into OCSL (the "Merger"). On October 29, 2020, OCSL and OCSI publicly announced the proposed Merger by, among other things, issuing a joint press release and hosting a public conference call for investors. As consideration for the proposed Merger, OCSI shareholders were offered OCSL shares in exchange for their OCSI shares. The joint press release (1) explained that the exchange ratio of OCSI shares to OCSL shares ("Exchange Ratio") would be determined at the Merger's closing and based on the ratio between the two companies' net asset values ("NAVs"), and (2) gave an illustrative example of the prospective Exchange Ratio—then, 1.39 OCSL shares for each OCSI share—using each company's June 30, 2020, NAVs. OCSL filed a Form 8-K on October 29, 2020, which specified that "[a]s of a mutually agreed date no earlier than 48 hours . . . prior to" the Merger, "each of OCSI and OCSL will deliver to the other a calculation of its [NAV] as of such date." Def. App'x. 288. In the joint press release and during the conference call, company executives expressed their enthusiasm about the Merger.

Tannenbaum first learned of the proposed Merger through these public announcements. Sometime between October 30 and November 1, he called Mathew Pendo, the president and chief operating officer of both OCSL and OCSI. Tannenbaum testified at his deposition that, as a large shareholder in both OCSI and OCSL, he was "concerned and curious" and wanted to understand if he "was being hurt . . . [or] benefitted" by how the companies would calculate their NAVs before the Merger. Pl. App'x 363. During Pendo's call with Tannenbaum (the "Pendo Call"), "Pendo pointed towards different parts of the public release documents to walk [Tannenbaum] through how the NAV was being calculated" and explained to Tannenbaum that the present NAV calculations were not final. *Id.* at 364. Tannenbaum testified that he and Pendo were "careful" to discuss only public information. *Id.* at 367.

On January 21, 2021, OCSL and OCSI filed with the SEC joint proxy materials regarding the proposed Merger. These materials contained three voting items for the OCSL shareholder meeting (collectively, the "OCSL Proposals"): (1) electing two new OCSL directors, (2) ratifying the appointment of an independent auditor, and (3) approving the issuance of OCSL common stock to be exchanged for OCSI shares in the proposed Merger (the "Merger Stock Issuance Proposal"). The OCSL board of directors unanimously recommended that OCSL's stockholders vote in favor of each proposal. The joint proxy materials set forth one voting item for the OCSI shareholder meeting: voting in favor of the Merger (the "Merger Proposal"). The OCSI board of directors unanimously recommended that OCSI's stockholders vote in favor of the Merger Proposal.

For the proposed Merger to succeed, it was necessary that (1) a majority of votes cast by OCSL shareholders on the Merger Stock Issuance Proposal were in favor of the proposal and (2) a majority of all outstanding OCSI shares voted in favor of the Merger Proposal. The Joint Proxy Materials disclosed that, as of January 19, 2021, Tannenbaum and his affiliates owned 21.6% of OCSI common stock. On February 4, 2021, OCSL filed a Form 8-K with the SEC, which contained an earnings presentation that provided an updated illustrative example of the projected Exchange Ratio—by then, 1.37—based on OCSI's and OCSL's NAVs as of December 31, 2020.

On February 8, 2021, Robyn Tannenbaum, Tannenbaum's wife, emailed Pendo. Her email stated: "We have received [Tannenbaum's] control numbers to vote his shares in the merger. Per our voting agreement, please let us know how you would like us to vote." Pl. App'x at 425. That same day, Pendo[1] responded: "Please vote in favor of all 3 proposals." *Id.* at 426. Robyn

---

[1] The parties do not dispute that Pendo was able to give valid written instructions on behalf of Oaktree Capital under the Voting Agreements.

4

Tannenbaum later, on Tannenbaum's behalf, voted in favor of all four voting items at the OCSL and OCSI shareholder meetings.

On March 15, 2021, the proposed Merger cleared both OCSL's and OCSI's shareholder votes. If Tannenbaum had not voted his shares in favor of the Merger Proposal, it would have failed to garner a majority of OCSI's outstanding shares, and the Merger would have failed. The Merger closed on March 19, 2021, with a final Exchange Ratio of 1.3371 OCSL shares per OCSI share. Whereas Tannenbaum beneficially owned 13% of OCSL's shares before the Merger, he owned 14.9% of OCSL's shares immediately after the Merger. As relevant here, within the statutory six-month window before and after the closing of the Merger, Tannenbaum sold 4,704,822 OCSL shares, for an alleged profit of $1,076,049.86.

Plaintiffs claim that Tannenbaum, a statutory insider of both OCSL and OCSI, violated Section 16(b) of the Act by realizing short-swing profits when he (1) voted, based on advance inside knowledge, in favor of the Merger, causing his OCSI shares to be exchanged for OCSL shares, and (2) sold OCSL shares on the open market at a profit within six months of the Merger. To recover alleged short-swing profits under Section 16(b), Plaintiffs must prove "that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir. 1998). But there is a narrow exception to Section 16(b)'s broad scope. "In limited circumstances, we scrutinize 'borderline' or 'unorthodox' transactions 'pragmatic[ally]' to determine whether they serve as a 'vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'" *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (alteration in original) (quoting *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*,

5

411 U.S. 582, 593–94 & n.26 (1973)). We apply this unorthodox transaction exception only if (1) the transaction is an "involuntary transaction by an insider," and (2) that insider "ha[d] no access to inside information." *Huppe*, 670 F.3d at 218–19. The district court granted Tannenbaum's motion for summary judgment because, in its view, there was no genuine dispute of material fact that Tannenbaum had satisfied both prongs of the unorthodox transaction exception.

We review the district court's grant of summary judgment *de novo*. *Kee v. City of New York*, 12 F.4th 150, 157 (2d Cir. 2021). "In doing so, we must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Id.* at 158 (internal quotation marks omitted). "Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

As to the first prong of the unorthodox transaction exception, we agree with the district court that Tannenbaum's Merger-related acquisition of OCSL shares was involuntary. This is because, pursuant to the Voting Agreements, Oaktree Capital instructed Tannenbaum in writing to vote his OCSL and OCSI shares in favor of the Merger. Plaintiffs submit that Pendo's February 8 email directed Tannenbaum to vote in favor of "all 3 proposals"—the OCSL Proposals—and therefore Tannenbaum retained agency as to a fourth proposal—the OCSI Merger Proposal—under the Voting Agreements. Plaintiffs further argue that, if there is any ambiguity about which proposals were meant by "all 3," this ambiguity should be resolved by a jury. We disagree. No reasonable factfinder could interpret Pendo's email instruction in the way Plaintiffs suggest. It would be nonsensical for Oaktree Capital to instruct Tannenbaum, a significant shareholder in OCSL and OCSI, to vote in favor of one necessary component of the Merger (the OCSL Merger

6

Stock Issuance Proposal) but leave him free to vote against the other component (the OCSI Merger Proposal). Moreover, even if the Merger required separate affirmative votes from two sets of shareholders, OCSL and OCSI jointly pitched it as a single proposal. In line with this understanding, Robyn Tannenbaum's February 8 email to Pendo, which asks how to "vote [Tannenbaum's] shares in the merger," does not distinguish between voting Tannenbaum's OCSL shares and his OCSI shares.

We are also unpersuaded by Plaintiffs' argument that Tannenbaum's acquisition of OCSL shares was voluntary because he freely entered into the Voting Agreements and affirmatively asked (through his wife) for Pendo's instruction. Tannenbaum entered into the Voting Agreements on July 13, 2017, which long preceded the six months before and after the Merger closed on March 19, 2021, and there is no evidence that Tannenbaum could have foreseen the Merger upon entering into the Voting Agreements in 2017. Moreover, whether the instruction was initiated by Pendo or delivered after an inquiry is irrelevant: in either event, Pendo's instruction contractually obligated Tannenbaum to vote his OCSL and OCSI shares in favor of the Merger. And we reject Plaintiffs' arguments that (1) the fact that Tannenbaum's vote was critical to the success of the Merger implies that it was voluntary, and (2) Tannenbaum's compliance with his contractual obligations under the Voting Agreements was voluntary because he could have breached these obligations.

As to the second prong of the unorthodox transaction exception, however, we are not satisfied that the evidence conclusively establishes that Tannenbaum had no access to inside information that he could have exploited in connection with the Merger. "[T]en percent holders can be presumed to have access to inside information because they can influence or control the issuer as a result of their equity ownership." *Huppe*, 670 F.3d at 219 (internal quotation marks omitted). This presumption can be rebutted. If the insider has no "access to material information

[such] that he might be able to exploit his advantage to the detriment of the general investing public," his information "is by definition not significant . . . and therefore it could not afford an opportunity for speculative abuse" under the orthodox transaction framework. *Heublein, Inc. v. Gen. Cinema Corp.*, 559 F. Supp. 692, 704 (S.D.N.Y.), *aff'd*, 722 F.2d 29 (2d Cir. 1983). But rebuttal is difficult. Where there is "'at least the possibility' of speculative abuse of inside information," section 16(b) "should be applied without further inquiry." *Huppe*, 670 F.3d at 219 (quoting *Blau v. Lamb*, 363 F.2d 507, 519 (2d Cir. 1966)).

Here, Tannenbaum was undoubtedly a statutory insider because of his beneficial ownership of OCSL and OCSI stock at all relevant times. However, the district court concluded that Tannenbaum indisputably rebutted the presumption that he had access to material inside information. We disagree.

Tannenbaum defends the district court's conclusion based on his deposition testimony about the Pendo Call. He testified that "Pendo pointed towards different parts of the public release documents to walk [him] through how the NAV was being calculated," Pl. App'x 364, and that he and Pendo were "careful" to discuss only public information, *id.* at 367. We find this testimony to be ambiguous. Although Tannenbaum asserted that only public information was discussed during the call, he also stated that Pendo walked him through "how the NAV was being calculated." Tannenbaum's testimony did not explain further what he meant by "how the NAV was being calculated," and it could fairly be inferred from the present record that some aspects of the valuation methodology were nonpublic.

We are also not compelled by Tannenbaum's argument that, even if he received nonpublic information about how the NAV was being calculated, this information was immaterial. Although the public had access to the formula used to determine the Exchange Ratio and illustrative

8

examples of the Exchange Ratio calculation, the Exchange Ratio formula is different from the NAV calculation methodologies. The Exchange Ratio effectively set the price paid for OCSI shares in the Merger by dividing the OCSI NAV per share by the OCSL NAV per share. The NAV calculation methodologies pertain to the steps taken by the companies to arrive at the NAVs *before* the Exchange Ratio is applied to them. Contrary to the district court's finding, it is not dispositive of the materiality question that "what the stocks' NAVs would be in the period 48 hours before the Merger . . . was inherently unknowable." *Donoghue v. Oaktree Specialty Lending Corp.*, 600 F. Supp. 3d 463, 482 (S.D.N.Y. 2022). Knowledge of the methodologies used to calculate the NAVs could have enabled an investor to better predict what the companies' NAVs would be at the time of the merger and, by extension, the exchange ratio. Therefore, nonpublic information about how these two NAV inputs were calculated could be material.

Finally, Tannenbaum points to the fact that the Voting Agreements prohibited him from "seek[ing] or propos[ing] to influence or control the management or policies of" OCSL and OCSI. *Id.* at 381, 408. Indeed, the Voting Agreements appear to have been designed to keep Tannenbaum from the type of inside information and control that statutory insiders are presumed to enjoy. However, the fact that Tannenbaum was able to have a private conversation with the CEO of OCSL and OCSI about how the NAV calculation would "hurt [or] benefit[] him" suggests that this contractual scheme did not entirely remove his insider status. *Id.* at 363.

For all of these reasons, we conclude that, given the vague nature of Tannenbaum's testimony, a reasonable factfinder could discern from the fact of the Pendo Call and its content that there was "at least the possibility of speculative abuse of inside information." *Huppe*, 670 F.3d at 219 (internal quotation marks omitted). Therefore, Tannenbaum did not indisputably carry his burden of showing that he had no access to material nonpublic information. As such, the

presumption that Tannenbaum was a statutory insider remained, and it was not Plaintiffs' burden to demonstrate that he had such access. We are accordingly not persuaded by the district court's holding that "the evidence adduced necessarily—and without any dispute of material fact" establishes the second prong of the unorthodox transaction exception. *Donoghue*, 600 F. Supp. 3d at 484.

It may be that additional evidence regarding the Pendo Call—including, potentially, further deposition of Tannenbaum—might conclusively show whether any material nonpublic information was discussed during the call. Therefore, we determine that the most efficient course of action is to remand for the district court to reopen discovery for this limited purpose, pursuant to the procedures adopted in *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994). If, following this procedure, the district court again concludes that granting summary judgment for Tannenbaum is appropriate, Plaintiffs may reinstate this appeal by submitting a letter to this Court so requesting no later than 30 days after the district court's determination. The Clerk shall direct any such appeal to this panel. If, however, the district court concludes that summary judgment for Tannenbaum is not appropriate, the district court should conduct further proceedings in the ordinary course, with any future appeals governed by the usual rules.

We therefore vacate the judgment and remand with instructions for the district court to reopen discovery for the limited purpose of determining (1) whether Pendo and Tannenbaum discussed the NAV calculation methodologies, (2) whether those methodologies were in fact nonpublic, and (3) how, if at all, such methodologies were immaterial.

\*   \*   \*

We have considered all of the parties' remaining arguments and find in them no basis to disturb the conclusions above.  Accordingly, we **VACATE** the judgment, and **REMAND** the case for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe,
Clerk of Court