669 F.2d 1162
 Fed. Sec. L. Rep. P 97,634
Seymour A. OLIFF, Plaintiff-Appellee,
v.
EXCHANGE INTERNATIONAL CORPORATION, the Issuer, a Delaware
Corporation, Defendant,
and
Edward L. Sax, Samuel William Sax and The Continental
Illinois National Bank and Trust Company of
Chicago, as Co-Trustee of George D. Sax,
Defendants-Appellants.
 No. 78-1830.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 23, 1980.
Decided Sept. 18, 1980.
Certiorari Denied Feb. 23, 1981.
See 101 S.Ct. 1358.
 
 Kevin M. Forde, Chicago, Ill., for defendants-appellants.
 Jerrold M. Shapiro, Chicago, Ill., for plaintiff-appellee.
 Before FAIRCHILD, Chief Judge, MARKEY, Chief Judge,* and BAUER, Circuit Judge.
 FAIRCHILD, Chief Judge.
 
 
 1
 This is an appeal from a judgment that defendants-appellants are liable for short-swing profits under Section 16(b) of the Securities Exchange Act of 1934.[1] 15 U.S.C. § 78p(b). Three issues are raised on appeal: (1) whether a corrective transaction undertaken to avoid a penalty for "self-dealing" under Internal Revenue Code section 4941(b), (e)(3) constituted a "purchase" within the meaning of section 16(b) of the Act; (2) whether a sale of shares of stock approved and supervised by the probate court was a "sale" within section 16(b); and (3), whether the district court erred in refusing to reduce the amount of profits awarded on account of expense incurred in connection with the "purchase" and "sale." We affirm.
 
 
 2
 Plaintiff-appellee Oliff brought this shareholder's derivative suit on behalf of defendant Exchange International Corporation (EIC) against the executors of the estate of George D. Sax and co-trustees of various trusts set up by decedent to recover profits resulting from a "purchase" and "sale" of EIC common stock to which section 16(b) of the Securities Exchange Act of 1934 allegedly applied.
 
 
 3
 The facts relevant to the "purchase" are as follows:
 
 
 4
 On December 28, 1972, George Sax donated $75,000 in cash to the Sax Foundation. On January 4, 1973, Sax sold 6,818 shares of his much larger holdings of EIC stock for $74,998 to a registered broker who, that same day, resold the 6,818 shares to the Sax Foundation for $75,098.
 
 
 5
 On November 28, 1973, a similar transaction took place. Sax sold 7,500 shares of EIC to the same registered broker for $75,000 which were resold that day to the Sax Foundation for $75,000. On December 3, 1973, Sax donated $75,000 in cash to the Foundation, which the Foundation used to pay for the last stock purchase.
 
 
 6
 On July 28, 1975, the Internal Revenue Service notified the estate of George Sax and the trustees of the Sax Foundation that the two stock transfers by Sax to the Sax Foundation constituted taxable acts of "self-dealing" by a disqualified person within the meaning of section 4941 of the Internal Revenue Code. Consequently, tax assessments of $307,905 (205% of the amount involved) would be due if the acts of self-dealing were not "undone" within the ninety-day correction period specified in sections 4941(e)(3) and (e)(4) of Internal Revenue Code. On advice of accountants and attorneys, the co-executors of the estate concluded that the IRS position could not be challenged successfully and as a result on December 22, 1975 the estate re-purchased from the Sax Foundation the 14,318 shares of EIC stock at $10.49 per share (1972-73 average purchase price). The IRS treated the re-purchase of the shares as a "correction" of the acts of self-dealing under section 4941 of the Internal Revenue Code, and abated the proposed tax assessments. The estate had owned more than ten percent of the EIC common before the re-purchase.
 
 
 7
 In January, 1976 there were offers made for the 190,727 shares held by the estate at $14.00 and $14.25 per share. The executors all favored sale, but seem not to have agreed on the sale to be made. Rhoda Sax, one of the executors, petitioned the Probate Division of the Circuit Court of Cook County for an order directing sale, and the other two executors petitioned for approval of a different sale. The court ordered a sale to the highest bidder on sealed bids. The shares were ultimately sold at $18.59 per share on May 7, 1976.
 
 
 8
 The parties agree that the transactions at issue involve an equity security, occurred within the six month period required by statute, and were undertaken by a beneficial owner of over ten percent of the common stock of EIC (the estate of George Sax). The dispute centers over the legal effect of the stock transactions: whether the "purchase" and "sale" are within the scope of section 16(b).
 
 
 9
 Section 16(b) was designed to prevent speculation in corporate securities by "insiders" such as directors, officers, and holders of more than ten percent of the stock. Congress intended the statute to curb manipulative and unethical practices resulting from misuse of corporate information for personal enrichment or unfair profit of the insider, thereby assuring the strict observance of the insider's fiduciary duties to outside shareholders and the corporation by removing the profit from short-swing dealing in corporate securities. Conversely, Congress sought to avoid unduly discouraging legitimate long-term investments in corporate capital by confining coverage to a six-month period. See Kern County Land Co. v. Occidental Corp., 411 U.S. 582, 591-595 n.23, 93 S.Ct. 1736, 1743, n.23, 36 L.Ed.2d 503 (1972); Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972); Bershad v. McDonough, 428 F.2d 693, 696 (7th Cir. 1970); Blau v. Lamb, 363 F.2d 507, 514-516 (2nd Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542. See generally, Wentz, Refining A Crude Rule: The Pragmatic Approach to Section 16(b) of the Securities Exchange Act of 1934, 70 Northwestern University L.Rev. 221 (1975).
 
 
 10
 To accomplish these goals, a relatively arbitrary rule capable of easy administration was enacted. Under its provisions any insider who purchases and sells, or sells and purchases the issuer's equity securities within a six-month period or less is automatically required to pay back to the issuing corporation all profits which have been realized from the transaction. By its terms section 16(b) imposes strict liability upon substantially all pairs of transactions occurring within the statutory time period, regardless of the intent of the insider or the use in fact of inside information. Such broad coverage was considered necessary to maximize the usefulness of the rule in eradicating abuses of inside information.
 
 
 11
 Two identifiable analytical frameworks for dealing with 16(b) issues have been developed by courts. Under the objective approach, the court, taking into account the broadly remedial purpose of the provision, will determine whether the pair of transactions and the individual come within the literal statutory requirements of 16(b). If so, the inquiry ends and liability attaches. No actual misuse of inside information is needed to create liability; fairness of a short-swing transaction or the insider's good faith is irrelevant. Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947); Gratz v. Claughton, 187 F.2d 46, 50 (2d Cir. 1951). Beneficial owners of more than ten percent of the stock of a corporation are presumed to have access to inside information and to have acted on the basis of this information by engaging in a short-swing transaction. Allis-Chalmers Mfg. Co. v. Gulf & W. Indus., Inc., 527 F.2d 335, 347 (7th Cir. 1975), cert. denied, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976).
 
 
 12
 The pragmatic, or subjective approach was developed in reaction to the severity of the objective approach. In this approach the words "purchase" and "sale" will not be given their broadest possible meaning. So-called "unorthodox," or perhaps a broader class of "borderline" transactions, will not be deemed a purchase or sale if the particular situation could not have given rise to an abuse of insider information. Where any possibility for speculative abuse of inside information exists, liability will ensue. Kern County Land Co. v. Occidental Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).
 
 
 13
 In Kern County, purchases within the scope of section 16(b) occurred when defendant acquired more than ten percent of the stock of a target company as result of a tender offer. The question before the Court was whether a statutory "sale" occurred either when the target of the tender offer defended itself by merging into a third company and the offeror, as an incident of the merger, exchanged its stock for that of the survivor, or when the offeror granted an option to the third company to purchase its shares, to be exercised outside of the six-month period. Kern County at 584, 93 S.Ct. at 1739. The Court determined that neither the exchange nor the option agreement constituted a sale within the meaning of section 16(b). Id. at 590-91, 93 S.Ct. at 1742. The Court stated that the congressional objective underlying section 16(b) liability must be considered in examining unorthodox transactions, such as exchanges resulting from mergers.[2] The Court concluded that the involuntary nature of the exchange of stock pursuant to a merger, coupled with the absence of the possibility of speculative abuse of inside information, excluded this exchange from a "sale" for the purpose of section 16(b). Id. at 600, 93 S.Ct. at 1747. The Court gave weight to the fact that defendant was not an insider under section 16(b) before it made its purchases, and therefore could not have undertaken those purchases on the basis of insider status.
 
 
 14
 With respect to the option agreement, the Court decided that as drafted and executed by the parties it did not offer measurable possibilities for speculative abuse.
 
 
 15
 In Allis-Chalmers Mfg. Co. v. Gulf & W. Indus., Inc., 527 F.2d 335 (7th Cir. 1975), a case involving the question whether section 16(b) applies to an initial purchase of more than ten percent of the shares by one who was an outsider until the purchase was completed and to subsequent additional purchases by the same party, this court had reason to explore the parameters of section 16(b) liability. The court concluded that the pragmatic approach articulated in the Kern County decision did not eliminate the objective rule. In fact, the objective rule of section 16(b) liability would still be applied unless the Kern County test was met: (1) the purchase or sale was an unorthodox transaction and (2) an analysis of the transaction disclosed no possibility of short-term speculative abuse. Id. at 351. Ordinary and voluntary purchases and sales would continue to trigger section 16(b) liability.
 
 
 16
 Relying on this court's interpretation of Kern County in Allis-Chalmers, the district court determined that neither the purchase nor the sale was an unorthodox transaction and that possibility for speculative abuse of inside information existed with regard to each.
 
 
 17
 Defendants argue that the Supreme Court's rationale for a finding of no sale in Kern County, the unique or involuntary nature of the exchange of stock together with no chance for speculative abuse, is applicable to the purchase and sale here. Appellants claim that the district court's reading of this court's opinion in Allis-Chalmers as limiting the teachings of Kern County to certain unorthodox transactions was entirely too narrow and suggest that the appropriate application of the pragmatic approach would be to all "borderline" transactions, (Kern County at 593-4, 93 S.Ct. at 1744), in which "the statutory concept of 'purchase' and 'sale' is blurred . . . ." Gold v. Sloan, 486 F.2d 340, 343 (4th Cir. 1973).
 
 
 18
 Assuming that Kern County's test is to be applied to a broader category of "borderline transactions" than those listed in Kern County as "unorthodox," we examine each of defendants' transactions for elements which could be deemed an aberration from purely ordinary purchase and sale transactions. In either instance are the aberrations sufficient to trigger the Kern County further test-the absence of the possibility of speculative abuse of insider information?
 
 
 19
 We consider, first, the sale. We have no difficulty in concluding that the peculiarities of this transaction are insufficient to take it out of a section 16(b) sale. All three executors favored a sale. There appeared to be a disagreement as to the preferred purchaser, a matter important to the individual executors because each had substantial holdings in EIC. Although the court ultimately directed the procedure to be followed, and the date, the terms of the sale, and the identity of the purchaser may have been affected as a result of the judicial procedure, the court in no sense compelled the sale and merely prescribed an orderly method of obtaining the highest price and incidentally determining the purchaser. Probably it is unnecessary to reach the second Kern County inquiry. In any event, it is apparent that one in the position of these executors could well have relied on inside information in deciding to sell as soon as possible rather than waiting to a later date.
 
 
 20
 Kern County involved a voluntary purchase followed by an involuntary sale. An argument can be made that the Kern County test is not appropriate in the opposite situation-an involuntary purchase paired with a subsequent voluntary sale-since the dangers of insider abuse of information are much more evident when the insider sells voluntarily, regardless of whether or not his earlier purchase was compelled, than when the purchase is voluntary but the sale is compelled. See Mau, Involuntariness and Other Contemporary Problems Under Section 16(b) of the Securities and Exchange Act of 1934, 27 Hastings L.J. 679 (1976). But see Ferraiolo v. Newman, 259 F.2d 342 (6th Cir. 1958). Under this analysis, having concluded that there was a voluntary sale within six months of the defendants' purchase of the shares from the Foundation, we would inquire no further and affirm the judgment based on a straight-forward application of the Act.
 
 
 21
 Assuming, however, that both transactions must fulfill the test of Kern County, we examine the aberrations of the acquisition from an ordinary purchase. The acquisition effected a rescission of prior sales. In order to escape a 205% tax assessment, the estate was required to undo the decedent's sales to the extent possible.
 
 
 22
 "Correction" is defined in section 4941(e)(3) of the Internal Revenue Code as "undoing the transaction to the extent possible, but in any case placing the private foundation in a financial position not worse than that in which it would be if the disqualified person were dealing under the highest fiduciary standards."
 
 
 23
 If the rescission were viewed as a full undoing or avoiding of the prior sales, so that it was as if they never happened, there would be no 16(b) problem, because the stock would have been held for years before the sale. We do not subscribe to this theory. One and one-half (11/2) to 21/2 years had elapsed between the original sales and the rescission, and the reason rescission was compelled by IRS was impropriety on the part of decedent Sax. The estate of the wrongdoer should not be allowed to claim, for its own benefit, that the offending sales should be treated as if they had never been made. The fact that the IRS accepted the transaction as an adequate undoing of the acts of self-dealing for the purpose of the tax law does not compel the unrealistic conclusion that the decedent and his estate had continuously owned the shares.
 
 
 24
 Defendants have cited a number of cases dealing with rescission in a section 16(b) context. All, however, either support the position we take here or are clearly distinguishable.[3]
 
 
 25
 The most difficult question in the case involves the acquisition transaction itself. We do recognize that the proposed assessment by IRS was economic compulsion to repurchase the shares from the Foundation. Payment of a tax of 205% of the sale price was scarcely a reasonable alternative to repurchase of the shares at that price. Nonetheless, we cannot say that the acquisition of the stock was so involuntary as to take it out of the definition of "purchase" for 16(b) purposes. Although the estate was compelled to "undo" the sales, the estate was given by statute a period of 90 days within which to do so, and in fact did not repurchase the shares until over two years after the first questioned transaction and almost six months after it had received the statutory notice of deficiency. Thus it appears that the timing of the purchase was not totally beyond the estate's control. The estate also apparently had some control over the price it paid for the stock. Although the estate was compelled to pay a price deemed an adequate correction, and satisfied the IRS that the original price of $10.49 was adequate under the statutory standard, the facts at least suggest that the IRS settled too cheap. Offers at $14.00 per share (albeit for a larger block) were received within a few weeks. The estate may well have had an obligation, particularly with inside information, to pay more in order to fulfill the standard of correction imposed by the Internal Revenue Code.
 
 
 26
 Even assuming that Kern County requires that the purchase as well as the sale must present the possibility of abuse of inside information, we are not persuaded that the acquisition in this case is not a purchase for section 16(b) purposes.
 
 
 27
 DEDUCTION OF EXPENSES OF THE PURCHASE AND SALE COSTS FROM PROFITS AWARDED CORPORATION
 
 
 28
 The district court refused to hold a hearing after its original decision to determine the amount of expenses incurred in the "purchase" and "sale." Direct transaction expenses such as brokerage commissions and transfer taxes are deductible in computation of short-swing profits. Blau v. Missions Corp., 212 F.2d 77 (2d Cir. 1954). Allis-Chalmers Mfg. Co. v. Gulf & W. Indus. Inc., 527 F.2d 335 (7th Cir. 1978).
 
 
 29
 Defendants had presented no evidence of deductible expenses in response to plaintiff's motion for summary judgment. There was no direct, properly deductible expense with regard to the purchase of stock from the Foundation. The Estate paid precisely $150,198.00 to the Sax Foundation (the exact amount the Foundation paid the broker for the EIC stock in 1972-1973) for the 14,318 shares. With regard to the sale, defendants seek "considerable attorneys fees incurred in the Probate Court proceedings and directly attributable to the . . . 'sale.' " No figures were presented to the district court, but defendants suggested an evidentiary hearing if the court agreed to make an allowance. The district court declined.
 
 
 30
 Under the circumstances, we think there was no error or abuse of discretion. Apparently a substantial part of the services rendered in probate court arose from a dispute over the choice of purchaser. Even if it should be ascertained what amount was reasonably necessary as expenses of sale, the sale involved 190,727 shares. It would be speculative to determine that any particular amount of fees was generated by the 14,318 shares with which we are concerned, only 7.5% of the total.
 
 
 31
 The judgment appealed from is Affirmed.
 
 
 
 *
 Chief Judge Howard T. Markey of the United States Court of Customs and Patent Appeals is sitting by designation
 
 
 [1]
 (b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months, . . . shall enure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months
 
 
 [2]
 Kern County Land Co. v. Occidental Corp., 411 U.S. 582, 593 n.24, 93 S.Ct. 1736, 1744, n.24. The Court stated that the term "unorthodox" has been applied to "stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassification, and dealings in options, rights, and warrants."
 
 
 [3]
 Volk v. Zlotoff, 285 F.Supp. 650 (S.D.N.Y.1968) (liability found even though officers and corporation wholly rescinded exercise of stock options); Hennessy v. Fein, 184 F.Supp. 86 (S.D.N.Y.1958) (judicially approved rescission given res judicata effect); Kahansky v. Emerson Radio and Phonograph Corp., 184 F.Supp. 96 (S.D.N.Y.1960) (amount paid for damages incurred when sale rescinded net profits for § 16(b) purposes); Morales v. Great American Corp., 445 F.Supp. 869 (M.D.La.1978) (rescission subsequent to complete accounting by officers to corporation; officers retained no profits); S & S Realty Corp. v. Klear-Vu Industries, Inc., CCH Fed.Sec.L.Rep. P 96,056 (S.D.N.Y.1977) (insider retained no profits after rescission)