David COLAN, Plaintiff,

v.

PRUDENTIAL–BACHE SECURITIES INC., et al., Defendants.

No. 82 C 6844.

United States District Court, N.D. Illinois, E.D.

June 20, 1983.

Seymour A. Oliff, Chicago, Ill., for plaintiff.

N.A. Giambalvo, James W. Collins, Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., Jeffrey Glekel, Linda Meisler, New York City, Jerold S. Solovy, Ronald L. Marmer, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiff, David Colan ("Colan"), a security holder of Prudential-Bache Securities Inc. ("Prudential-Bache"), has brought this action on behalf of Prudential-Bache for recovery of shortswing profits realized by defendant First City Financial Corporation Ltd. ("First City") allegedly in violation of section 16(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C.

§ 78p(b).[1] Colan asserts that First City earned approximately $8,000,000.00 in profits from its trading in the stock of the Bache Group Inc. ("Bache"). Currently pending is First City's motion for summary judgment.

## I. *Factual Background.*

The circumstances giving rise to this action are as follows.[2] On March 21, 1979, the Bel Companies[3] began purchasing the common stock of Bache, reporting in a Schedule 13D statement filed with the SEC on that same date that "[s]ince the Corporations intend to consider seeking to acquire control of the Issuer their position cannot be considered solely that of a passive investor." By late June, 1979, the Bel Companies had become the beneficial owners of 7.8% of Bache's outstanding common stock.

On September 13, 1979, Samuel Belzberg ("Belzberg") met with Harry A. Jacobs ("Jacobs"), Chairman of Bache, and H. Virgil Sherrill ("Sherrill"), the President and director of Bache. According to Amendment No. 4 to the Bel Companies' Schedule 13D, dated October 4, 1979, Belzberg indicated that he was interested in increasing his investment in Bache to between 20% and 25% of the latter's outstanding common stock. In a letter from Bache's Board of Directors to Belzberg, dated September 24, 1979, and attached as an exhibit to Amendment No. 4, Jacobs stated:

> "The Board of Directors agree that an increase in ownership by you of Bache shares would be contrary to the interests of Bache and its shareholders."

Despite this letter, the Bel Companies continued purchasing Bache stock and by late June, 1980, they owned 8.2% of the outstanding common stock.

On July 14, 1980, the Bel Companies sold all their common stock, amounting to 778,700 shares, to First City "in order to realign the investment within the corporate group on more satisfactory business terms." *See* Schedule 13D, filed with the SEC on July 23, 1980, at 7–8.

On July 15 and 16, 1980, First City purchased 115,600 shares of Bache common stock, which boosted its holdings to over 10% of Bache's outstanding common stock. Additional purchases soon led to holdings of approximately 16.8%.

According to a Request by Bache for an Investigation and Public Hearings and an Order Prohibiting Purchases Pending Hearings ("the Request"), filed with the Attorney General of the State of New York, Belzberg, at a December 16, 1980,

---

**1.** Section 16(b) provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months, ... shall enure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months."

**2.** As will be revealed by the following discussion, most of the factual background is taken from statements by Bache, the party which would recover from First City if plaintiff's suit is successful, as those statements were reported in various filings and requests submitted to such governmental agencies as the Securities and Exchange Commission ("SEC") and the Attorney General of the State of New York. These mate-

rials were furnished by First City as exhibits to the affidavit of Jeffrey Glekel ("Glekel"), counsel for First City, and submitted in support of defendant's motion for summary judgment. While Colan states that he cannot—and implies that the court should not—accept First City's statement of the facts as a complete statement on the ground that he was unable to conduct discovery prior to the filing of First City's motion, he does concede the accuracy of the exhibits attached to the Glekel affidavit. *See* Memorandum in Opposition to First City Financial Corporation Ltd's Motion for Summary Judgment, p. 2.

**3.** As of March 21, 1979, the Bel Companies owned over 80% of the voting shares of First City. The Bel Companies consist of Bel-Fran Investments Ltd., Bel-Cal Holdings Ltd. and Bel-Alta Holdings Ltd., three holding companies controlled by Samuel, William and Hyman Belzberg.

meeting with Jacobs, indicated a desire to be elected to the Bache Board and to be allowed to designate another member of the Board. Bache understood this to be an attempt by Belzberg to "take over Bache," *Request*, at 1, and to "influenc[e] the control" of Bache. *Id.* at 17. In response to this perceived attempt, Bache sought an order from the New York Attorney General prohibiting First City and the Belzberg family from purchasing any additional shares of Bache. Bache asserted in the Request, in part, that the Belzberg family had "embark[ed] on an aggressive market purchase program without disclosing detailed information about themselves, their plans or even the terms of the bid, ... compell[ing] Bache shareholders to speculate about these factors while forcing them to make an important investment decision[,]" *Id.* at 13–14. The Request also stated that the charged parties had "actively solicit[ed] shares of Bache through a variety of methods in furtherance of their takeover bid and, accordingly, are in violation of the New York Act [the New York Security Takeover Disclosure Act, N.Y.BUS. CORP.LAW § 1601 (Consol. 1982)] for making such a bid without making the required disclosure." *Id.* at 16.

By February 18, 1981, First City had increased its holdings to approximately 22.6% of Bache's outstanding common stock. Amendment No. 2 to Bache's Schedule 14D–9, filed with the SEC on April 2, 1981, indicates that it was soon after these additional purchases that Bache contacted The First Boston Corporation ("First Boston") in an effort to locate a purchaser of the entire company. On March 3, 1981, First Boston approached The Prudential Insurance Company of America ("Prudential") concerning the latter's possible acquisition of Bache. Bache and Prudential engaged in discussions concerning the possible acquisition, while at the same time Bache also met with First Boston to examine other potential acquirers. Belzberg asserts in an affidavit filed in support of First City's motion that neither First City nor its representatives participated in or were informed of Bache's negotiations with Prudential.

On March 18, 1981, Prudential offered to acquire all of Bache's outstanding common stock for $32 per share through a cash tender offer to be followed by a second step cash merger. On that same day, the Bache Board approved acceptance of Prudential's offer, and the agreement was announced publicly on March 19. In recommending acceptance of the first step cash tender offer, Bache stated in its Schedule 14D–9, at 4, dated March 20, that

> "the Company [Bache] was mindful of the continuing market purchases by First City ... which posed a threat that it would gain control of the Company, leaving minority stockholders who would not have the opportunity to receive a price for their shares as high as that offered by [Prudential]."

This same statement was repeated in the proxy materials distributed to Bache shareholders and recommending approval of the second step cash merger.

On March 23, 1981, Pru Holdings Inc. ("Pruho"), a wholly-owned subsidiary of Prudential, commenced a tender offer for all of the outstanding Bache common stock at a price of $32 per share. Pursuant to this tender offer, Pruho acquired approximately 70% of Bache's outstanding common stock. At a special meeting of Bache shareholders held on June 11, 1981, the merger of Pruho and Bache was approved despite the fact that First City voted all of its shares against the merger. On June 12, pursuant to the terms of the merger, the 2,440,975 shares of Bache stock owned by First City were converted into the right to receive $32 per share in cash.

## II. *Legal Contentions of the Parties.*

The legal contentions of the parties can be briefly summarized. Plaintiff Colan alleges that the conversion by First City of its Bache shares into the right to receive $32 per share in cash on June 12, 1981 was a "sale" of an equity security within the meaning of section 16(b) of the Act. Because First City was the beneficial owner

of more than 10% of Bache's outstanding common stock at all times within six months of June 12, 1981, Colan concludes that the profits earned by First City from the conversion of such shares constitute short-swing profits by an insider and therefore are recoverable by Prudential-Bache under section 16(b).

In support of its motion for summary judgment, First City contends that the conversion of its Bache stock into cash, pursuant to the merger which it opposed, was not a "sale" within the meaning of section 16(b).

### III. *Kern County, Its Progeny and the Pragmatic Approach.*

Two identifiable analytical approaches for dealing with section 16(b) issues have been developed by the courts. As noted in *Oliff v. Exchange International Corp.*, 669 F.2d 1162, 1165 (7th Cir. 1980), under the objective approach, a court must determine whether the transactions and the involved party fall within the literal and broadly remedial requirements of section 16(b). If so, the inquiry ends, liability attaches and profits must be returned. *Id.* In an orthodox transaction, beneficial owners of more than 10% of a corporation's stock are presumed to have access to inside information and to have acted on the basis of such information by engaging in a short-swing transaction. *Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc.*, 527 F.2d 335, 347 (7th Cir.1975), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976).

In *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), the Supreme Court developed a "pragmatic," or subjective, approach to questions of section 16(b)

liability in cases involving certain "unorthodox" transactions. Under this approach, a court must determine whether an "unorthodox" or "borderline" transaction—that is, one not ordinarily thought of as a sale or purchase but arguably within the broad statutory definition [4]—comes within the reach of section 16(b) by inquiring "whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information...." *Kern County*, 411 U.S. at 594, 93 S.Ct. at 1744 (footnote omitted).

In *Kern County* itself, purchases within the scope of section 16(b) occurred when defendant Occidental acquired more than 10% of the stock of Old Kern, the target company, as a result of a tender offer. While the offer was in effect, Old Kern engineered a defensive merger with Tenneco, involving an exchange of all shares of Old Kern stock for shares of Tenneco stock. Occidental attempted to block the proposed merger, but eventually dropped its efforts after negotiating certain option arrangements with Tenneco.[5] At a meeting of Old Kern shareholders to vote on the merger, Occidental did not vote its shares but indicated that, had it done so, it would have voted in favor of the merger. Once the merger was closed, all Old Kern shareholders, including Occidental, became irrevocably entitled and committed to exchange their Old Kern holdings for Tenneco preferred stock. *Id.* at 584–89, 93 S.Ct. at 1739–41.

The Supreme Court held that this exchange did not constitute a "sale" within section 16(b). In so ruling, the Court placed great emphasis on two factors: (1) the involuntary nature of the exchange; and (2) the absence of the possibility of

---

**4.** The Court in *Kern County*, 411 U.S. at 593 n. 24, 93 S.Ct. at 1744 n. 24, stated that the term "unorthodox" has been applied to "stock conversions, *exchanges pursuant to mergers* and other corporate reorganizations, stock reclassification, and dealings in options, rights, and warrants." (Emphasis supplied.)

**5.** Occidental entered into an agreement with Tenneco whereby the latter had a binding option to purchase Occidental's holdings, although the option was not exercisable until six months after the last acquisition of Old Kern stock by Occidental. The Court ruled that the execution of this option agreement was not a "sale" under section 16(b). *Kern County*, 411 U.S. at 601–04, 93 S.Ct. at 1748–49.

speculative abuse of insider information.[6] With regard to the first factor, the Court observed that the merger was not arranged by Occidental, but was sought by Old Kern to frustrate Occidental's attempts to gain control of Old Kern. Furthermore, once the merger was approved, Occidental had no real alternative concerning the disposition of its Old Kern shares. While it could have sold the shares before the merger was closed, such an act would have subjected Occidental to *prima facie* section 16(b) liability. *Kern County*, 411 U.S. at 599–600, 93 S.Ct. at 1747. With regard to the second factor, the Court noted that while Occidental was a statutory insider at the time it extended the tender offer, its clear adversarial posture vis-a-vis Old Kern's management afforded little possibility of access to inside information by virtue of its stock ownership. *Id.* at 598–99, 93 S.Ct. at 1746–47.

*Kern County* has been interpreted and applied in two decisions highly relevant to the case at bar. In *American Standard, Inc. v. Crane Co.*, 510 F.2d 1043 (2d Cir. 1974), *cert. denied* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975), defendant began purchasing large quantities of the common stock of Westinghouse Air Brake Company ("Air Brake"). Air Brake declined Crane's proposals for a merger and, instead, engineered a defensive merger with Standard. Crane, which at this point owned in excess of 10% of Air Brake's outstanding stock, then made a tender offer for the shares of Air Brake. This tender offer failed, and the Air Brake-Standard merger was approved. Pursuant to the terms of this merger, Crane exchanged its Air Brake common shares for the preferred shares of Standard. Crane eventually sold these shares, obtaining a profit of approximately $10,000,000.00. *American Standard*, 510 F.2d at 1047–49.

The Second Circuit found that the two factors highlighted by the Supreme Court in *Kern County* were also present in *American Standard*. Crane's exchange was involuntary, since it was essentially powerless to control the course of events in light of the opposition by Standard's management. There existed an atmosphere of hostility, rendering it unlikely that Crane would have access to insider information by virtue of its greater than 10% ownership. *Id.* at 1054. As summarized by the court:

> "We believe that *Kern County* holds the defensive merger situation to be *sui generis* in terms of § 16(b) liability. The implication is that the status of a defeated tender offeror affords no presumption of abuse of confidential information by virtue of relationship to the issuer. By status it is accordingly not 'presumed to be an insider who will receive information regarding the company before it is made public.' ... The adversary stance also rebuts the presumption of control."

*Id.* at 1053 (citation omitted).

Although Crane in *American Standard* continued to attempt to defeat the Air Brake-Standard merger, whereas Occidental in *Kern County* gave up the fight in the face of Old Kern's proposed merger with Tenneco, the Second Circuit held that this difference did not alter the basic similarity between the two transactions. *Id.* The court thus found that Crane's exchange of shares was not a "sale" and would not subject it to section 16(b) liability for short-swing profits. *Id.* at 1055.

Presented with facts quite similar to those in the instant action, the court in *Heublein, Inc. v. General Cinema Corp.*, 559 F.Supp. 692 (S.D.N.Y.1083), discussed and applied the principles promulgated in *Kern County*. There, General Cinema began purchasing substantial quantities of the common stock of plaintiff's predecessor, Old Heublein, in an apparent attempt to acquire control of Old Heublein.[7] As

---

**6.** As the Court summarized: "[T]he involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that § 16(b) should not apply to transactions such as this one." *Kern County*, 411 U.S. at 600, 93 S.Ct. at 1747.

**7.** In response to General Cinema's initial accumulation, Old Heublein filed suit against General Cinema alleging that the latter's Schedule 13D

part of an effort to resolve the expected contest for control, the Chief Executive Officer of Old Heublein approached executives at General Cinema concerning a possible "asset swap" of the Old Heublein stock owned by General Cinema for part of Old Heublein's wine business. During the course of these discussions, Old Heublein provided General Cinema with information, not available to the general public, concerning its wine business. Negotiations broke down, however, and General Cinema continued to purchase Old Heublein stock. The latter then commenced discussions with B.J. Reynolds concerning a possible merger. B.J. Reynolds subsequently extended a tender offer, the offer was completed and the merger of Old Heublein and B.J. Reynolds was approved despite the fact that General Cinema voted all its shares against the merger. *Heublein,* 559 F.Supp. at 695.

At the outset of its well-reasoned opinion, the court noted that the transaction at issue was indeed "unorthodox" as that term was defined in *Kern County.* It found that a pragmatic inquiry was justified because the transaction was "a forced exchange of securities pursuant to a merger, [and] *is simply not a 'garden variety'* sale." *Id.* at 698. The court then analyzed the circumstances giving rise to the action in terms of the two factors highlighted in *Kern County.* The *Heublein* court first noted that once the merger was agreed upon by Old Heublein and B.J. Reynolds, General Cinema was "utterly powerless to influence subsequent events," *Id.* at 699, since Old Heublein had the necessary votes regardless of the position adopted by General Cinema. The court further observed that once the merger was approved, General Cinema, like Occidental in *Kern County,* had no viable alternative as to the future of its Old Heublein shares; an open-market sale at that point would have resulted in *prima facie* liability under section 16(b). *Id.; see also Kern County,* 411 U.S. at 599–600, 93 S.Ct. at 1747.

After concluding that the exchange of shares by General Cinema was involuntary, and that it therefore satisfied the first prong of the *Kern County* test, the *Heublein* court then analyzed the possibility for speculative abuse by General Cinema. The court noted that the principal distinction between the case before it and both *Kern County* and *American Standard* was that General Cinema had never made a formal tender offer. Despite this distinction, the court stated, in language highly relevant to the case at bar:

> "The important question ... is whether General Cinema's position as an 'unwelcome investor,' ... afforded it access to inside information in a manner that raised the potential for speculative abuse, which was lacking in *Kern County* and *American Standard.* Although the question is not free of doubt, I conclude that an unwelcome investor who is forced to exchange his stock pursuant to a merger arranged by the issuer to rid itself of the investor's threat to obtain control should be treated for purposes of § 16(b) liability in the same manner as a defeated tender offeror who must make a similar exchange after losing the battle to a white knight. Such transactions simply do not give rise to a potential for speculative abuse."

*Heublein,* 559 F.Supp. at 702 (footnote omitted). While the court found troublesome the asset swap discussions between Old Heublein and General Cinema, it emphasized that the non-public information disclosed was not "material" and that the unwavering hostility between the two companies made it quite unlikely that General Cinema, by its status as an insider, would have had access to inside information. *Id.* at 703–04. The second prong of the *Kern County* test having been satisfied, the court concluded that General Cinema's exchange of Old Heublein stock for B.J.

---

statement was false, misleading and failed to disclose that General Cinema's true intent in purchasing Old Heublein stock was to acquire

control of Old Heublein. *Heublein,* 559 F.Supp. at 694.

Reynolds stock was not a "sale" under section 16(b). *Id.* at 705.[8]

IV. *Applicability of Kern County and its Progeny to the Case at Bar.*

Colan offers several arguments in support of his claim that the principles espoused in *Kern County* and its progeny are inapplicable to the case at bar. First Colan contends that First City's conversion of its Bache stock into the right to receive $32 per share in cash was not an unorthodox transaction. Second, he argues that even assuming that the conversion qualifies as an unorthodox transaction, First City's receipt of cash rather than securities for its Bache shares distinguishes the instant case from *Kern County*. Third, Colan claims that First City's disposition of its Bache shares was voluntary. Finally, plaintiff asserts that First City had access to inside information.

A. *The Unorthodox Nature of the Transaction.*

■ Despite Colan's protestations to the contrary, it is clear that a pragmatic analysis is justified in this case. The transaction which plaintiff wishes to classify as a "sale"—a forced exchange of securities pursuant to a merger—is plainly not the type of garden variety sale to which the literal and broadly remedial requirements of section 16(b) apply. See *Heublein*, 559 F.Supp. at 698. Indeed, the Supreme Court in *Kern County* expressly mentioned "exchanges pursuant to mergers" as an example of an unorthodox transaction. *See Kern County*, 411 U.S. at 593, n. 24, 93 S.Ct. at 1744, n. 24: *see also* note 5, *supra*. Characterizing the instant transaction as unorthodox in nature is entirely consistent with the Court's directive in *Kern County* that section 16(b) should serve to prevent short-swing speculation based on inside information, without reaching other conduct not giving rise to the potential for such abuse. *See Kern County*, 411 U.S. at 593–94, 93 S.Ct. at 1744.[9]

Plaintiff's reliance on *Tyco Laboratories, Inc. v. Cutler-Hammer, Inc.*, 490 F.Supp. 1 (S.D.N.Y.1980), in support of his claim that

---

**8.** *Kern County* has been discussed by the Seventh Circuit in two principal cases. In *Oliff v. Exchange International Corp.*, 669 F.2d 1162 (7th Cir.1980), plaintiff brought suit against executors of the estate of one Sax for recovery of short-swing profits allegedly realized in violation of section 16(b). In this complicated factual scenario, the executors had received offers for shares by the estate and, while all favored the sale, they never agreed that the sale would be made. One of the executors petitioned the Probate Division of the Circuit Court of Cook County for an order directing the sale, and the other two executors petitioned for approval of a different sale. The Circuit Court ultimately ordered a sale to the highest bidder. *Oliff*, 669 F.2d at 1164–65.

Presented with these facts, completely different in nature from those giving rise to the instant case, then Chief Judge Fairchild found no reason to apply the pragmatic approach set forth in *Kern County* and concluded that the transaction constituted a section 16(b) sale. First, he noted that while there was some disagreement among the executors as to the preferred purchaser, all three executors favored a sale. Second, he observed that although the Circuit Court directed the terms of the sale, the procedure to be followed and the identity of the purchaser, it "in no sense compelled the sale...." *Id.* at 1167. Finally, Chief Judge Fairchild stated that "one in the position of these executors could well have relied on inside information in deciding to sell as soon as possible rather than waiting to a later date." *Id.*

In *Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc.*, 527 F.2d 335 (7th Cir. 1975), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976), the court concluded that the pragmatic approach articulated in *Kern County* did not eliminate the objective rule. Rather, the objective rule would still be applied unless it was shown

1) that either the purchase or sale was an unorthodox transaction, and 2) that an analysis of the unorthodox transaction discloses no possibility of short-term speculative abuse.

*Allis-Chalmers*, 527 F.2d at 351. The court stated that ordinary and voluntary purchases and sales would continue to trigger section 16(b) liability. *Id.*

**9.** Of course, the court's conclusion that the pragmatic approach, rather than an objective standard, applies to this action is in no way dispositive on the question of liability:

"Simply because the Court undertakes a pragmatic analysis does not guarantee that the transaction ... will be exempt from § 16(b) liability. Rather, that approach only ensures that liability will not attach to transactions which do not threaten the evils § 16(b) is designed to prevent."

*Heublein*, 559 F.Supp. at 698.

the instant transaction is not unorthodox in nature is clearly misplaced. There, Tyco, a 10% beneficial owner of the outstanding stock of Cutler-Hammer, sold its entire holdings to Eaton Corporation within six months of some of its purchases for cash and other consideration. Tyco contended that "the existence of a 'control contest type of situation' render[ed] the transaction ... 'unorthodox' within the meaning of *Kern County*....", *Tyco*, 490 F.Supp. at 6, a claim which the court rejected. In contrast to *Kern County, American Standard, Heublein* and the case at bar, however, the statutory insider in *Tyco* chose the party to whom it sold its holdings of the issuer's stock, as well as the terms and timing of the sale. There was no evidence before the *Tyco* court of a selection by the issuer of a white knight with whom the issuer could merge in order to counter a perceived takeover bid. *Tyco*, therefore, involves a sharply different factual scenario than that presented here.

### B. *Receipt of Cash by First City.*

■ Colan's contention that First City's receipt of cash, rather than securities, for its Bache shares renders this case distinguishable from the *Kern County* line of cases merits little discussion. Plaintiff has failed to offer any concrete reason for distinguishing this action on the basis of the consideration received upon disposition, and the court fails to find any. As First City correctly notes, the critical issue is not the form of the consideration but rather the nature of the disposition itself: was the disposition involuntary, and did the entire transaction, when viewed in its entirety, provide the opportunity for speculative abuse? It is these fundamental questions to which the court now turns.

### C. *The Involuntary Nature of the Transaction.*

■ An exchange pursuant to a merger is "involuntary" where the unsuccessful party has an "utter inability ... to control

the course of events." *American Standard*, 510 F.2d at 1054. This standard, the first prong of the *Kern County* test, has been satisfied in the case at bar.

■ Once the merger of Bache and Prudential was agreed upon by the Boards of the respective companies, First City was powerless to influence the subsequent course of events. Whether First City approved or opposed the merger was completely irrelevant, for while Bache needed the consent of its shareholders, its management had all the necessary votes without the acquiescence of First City. Indeed, the merger was approved by Bache's shareholders despite the negative vote by First City of all of its shares. Furthermore, the facts reveal unequivocally that the conversion of Bache stock into the right to receive $32 per share occurred pursuant to the express terms of the merger between Bache and Prudential. The merger was not engineered by First City, but was specifically designed to frustrate the attempts by the Belzberg family to obtain control of Bache.

In this fashion, the decisions in *Kern County* and *Heublein* are squarely on point. In *Kern County*, the Old Kern-Tenneco merger was approved by a majority of Old Kern shareholders despite the fact that Occidental failed to vote its shares either for or against the merger.[10] The Court's finding that the exchange of Occidental's Old Kern stock for Tenneco stock was involuntary was grounded on the fact that Occidental was simply in no position to affect the outcome of the vote. *Kern County*, 411 U.S. at 599, 93 S.Ct. at 1747. Similarly, in *Heublein*, the management of Old Heublein had the votes necessary to obtain approval of the Old Heublein-Reynolds despite the negative votes of General Cinema. Because General Cinema's votes were without significance, the court found the company lacking any means to influence subsequent events. *Heublein*, 559 F.Supp. at 699.

---

**10.** Occidental's failure to vote was, under the applicable state law, tantamount to a vote against approval of the merger. *Kern County*, 411 U.S. at 600, 93 S.Ct. at 1747.

Finally, once the Prudential-Bache merger was approved, First City, like Occidental in *Kern County* and General Cinema in *Heublein*, was left with no real choice as to the future of its Bache shares. A voluntary open-market sale of those shares would have resulted in *prima facie* liability under section 16(b). *See Kern County*, 411 U.S. at 600, 93 S.Ct. at 1747; *Heublein*, 559 F.Supp. at 699.

Thus, precisely because First City's votes were entirely without significance, the court concludes that defendant's subsequent conversion of Bache stock into the right to receive $32 per share must be deemed involuntary.[11]

### D. *Access to Inside Information and the Possibility of Speculative Abuse.*

The first prong of the *Kern County* test having been satisfied, the remaining question is whether there existed the possibility of speculative abuse of inside information by First City. As set forth in detail in Part I, *supra*, First City was clearly perceived as an undesirable and unwelcome investor by the Bache management. Indeed, the uncompromising hostility between the parties is plainly illustrated by the Bache Board's September 24, 1979, response to Belzberg, its Request filed with the New York Attorney General and its characterization of First City's actions in the proxy materials distributed to shareholders.[12]

Of course, the fact that First City did not make a formal tender offer distinguishes this action from *Kern County* and *American Standard*. This court, however, agrees with the reasoning of Judge Connor in *Heublein* that the principles set forth in *Kern County* and adopted in *American Standard* need not be restricted to instances where there has been a formal tender offer. First City was clearly perceived as an unwelcome investor, and was forced to convert its shares pursuant to a merger engineered by Bache to eliminate the threat by the Belzberg family to obtain control. Under such circumstances, First City should be viewed in precisely the same manner as both Occidental in *Kern County* and Crane in *American Standard*—as a defeated tender offerer who must make an exchange "after losing the battle to a white knight." *Heublein*, 559 F.Supp. at 702.

Colan contends that the possibility of access to inside information is demonstrated by "meetings between Samuel Belzberg ... and either or both of Harry A. Jacobs, Jr. ... and H. Virgil Sherrill ... [which] occurred in May, 1979, September, 1979, October, 1980, and December, 1980." Plaintiff's Memorandum in Opposition to First City Financial Corporation Ltd's Motion for Summary Judgment, at 7. Plaintiff argues that "it is a question of fact as to what constitutes inside information and whether the *possibility* of speculative abuse existed." *Id.* at 8 (emphasis in original).

Upon careful analysis, Colan's argument falls far short of raising a genuine issue of material fact. The extreme hostility, detailed in Part I, *supra*, that characterized the relationship between Bache and First City belies any claim that there existed potential for speculative abuse. Beyond the naked assertion that certain meetings took place, Colan has simply failed to present anything in connection with First City's acquisition of Bache stock pursuant to its pattern of purchases to indicate ei-

---

**11.** Colan errs in relying on *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631 (S.D.N.Y. 1974), in support of his claim that the instant transaction was voluntary. There, the court specifically observed that, unlike Occidental in *Kern County*, the insider before it retained some control over the circumstances of the sale. For example, the insider was responsible for locating a buyer for its stock, for initiating negotiations with that buyer and for at least suggesting the terms of the sale. *Makofsky*, 383 F.Supp. at 643. None of these factors is present in the case at bar.

**12.** The many examples of hostility detailed in Part I, *supra*, demonstrate that the case for summary judgment is even stronger here than in *Heublein*, where the court was concerned with the asset swap discussions between Old Heublein and General Cinema. *Heublein*, 559 F.Supp. at 703–05. Nothing resembling those discussions is present in the case at bar.

ther the possibility of inside information being available to First City by virtue of its stock ownership or the potential for its speculative abuse of such information.

### V. *Colan's Request for Discovery.*

Colan's final argument in opposition to First City's motion is that defendant is not entitled to summary judgment until he has had an opportunity to conduct discovery on the meetings between First City and Bache. Plaintiff has filed an affidavit pursuant to Fed.R.Civ.P. 56(f),[13] requesting that he be allowed to take the depositions of Belzberg, Jacobs, Sherrill and other unidentified witnesses. He also seeks notes taken by Jacobs after the latter's December 16, 1980, meeting with Belzberg.

 It is well established that a plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be denied when the record demonstrates that the requested discovery is not likely to produce the facts necessary to defeat the motion. *See, e.g., First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (limitations on general pre-trial discovery and denial of further Rule 56(f) discovery not improper as additional discovery would merely amount to a fishing expedition); *Paul Kadair, Inc. v. Sony Corp. of America,* 694 F.2d 1017, 1029–30 (5th Cir.1983) (Rule 56(f) request properly denied when additional discovery is unlikely to produce necessary facts); *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) (same). A "bare assertion" that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f). *Contemporary Mission,* 648 F.2d at 107. Rule 56(f) cannot be utilized to defeat a motion for summary judgment "where the

result of a continuance to obtain further information and discovery would be wholly speculative ..." 6 J. Moore, *Moore's Federal Practice* ¶ 56.24 at 56–1438 (2d ed. 1982) (footnote omitted).

 In light of these principles and the undenied facts in the record, there is little likelihood of Colan obtaining through additional discovery, any information useful in disposing of the issues presented here. With regard to plaintiff's request for Jacobs' notes of the December 16, 1980, meeting, the court observes that the notes, together with an affidavit by Jacobs attesting to their accuracy, were submitted by Bache to the New York Attorney General in February, 1981, as an exhibit to its Request and are therefore a matter of public record. Most importantly, however, the court finds it highly unlikely that Colan's discovery request, if granted, would produce any significant probative evidence of access to inside information and potential for speculative abuse in refutation of the factual background established thus far. Accordingly, Colan will not be allowed to engage in an open-ended search with the hope of fortuitously discovering some unknown evidence of speculative abuse.

### VI. *Conclusion.*

For the reasons stated above, First City's motion for summary judgment is granted. The transaction at issue does not, as a matter of law, represent the type of "evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information...." *Kern County,* 411 U.S. at 594, 93 S.Ct. at 1744 (footnote omitted). The cause is ordered dismissed.

---

**13.** Fed.R.Civ.P. 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."